**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Case No. 22-cv-6273** |
| **Plaintiff,** | **COMPLAINT** |
| **vs.** | **Jury Trial Demanded** |
| **CITY OF ROCHESTER, NEW YORK, ROSILAND BROOKS-HARRIS, CAPITAL MARKETS ADVISORS, LLC, RICHARD GANCI, AND RICHARD TORTORA,** | |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("the Commission") alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      On August 7, 2019, the City of Rochester, New York ("Rochester" or the "City"), led by its former finance director Rosiland Brooks-Harris ("Brooks-Harris"), sold approximately $119 million in municipal bonds to investors on behalf of the Rochester City School District (the "District").

2.      The City and Brooks-Harris told investors that $50 million of the amount raised would "be used to offset the effects of timing differences between cash receipts and disbursements," as the District awaited anticipated funding from the State of New York.  The remaining $69 million was to provide financing for the District, as well as other City projects.

3.      The District is the largest component of the City's budget, and the District was expected to repay the $50 million.  Thus, the offering documents,

prepared by Brooks-Harris and the City's long-time municipal advisor, Capital Markets Advisors, LLC ("CMA") and Richard Ganci ("Ganci"), included financial information about the District. Accordingly, the District's finances were important to investors.

4.      The City's offering documents were materially misleading. They contained outdated financial statements for the District and failed to disclose that the District was experiencing unusual financial distress. Indeed, in a July 2019 call with a credit rating agency, the District's then-CFO stated that the District's spending was within the budget for fiscal year 2019 that had just ended on June 30, 2019. With respect to the District's finances, the Defendants' message to the rating agency and to investors was "there's nothing to see here."

5.      On September 18, 2019, only 42 days after the offering, the District's auditors revealed what was obvious to Brooks-Harris and Ganci before the offering—that the District was experiencing extreme financial distress due to rampant overspending on teacher salaries. In fact, the District overspent its budget for fiscal year 2019 by $27.6 million, resulting in a downgrade of the City's debt rating and requiring the intervention of the State of New York in the form of a $35 million loan and the appointment of a monitor for the District.

6.      Prior to the bond offering, the City and Brooks-Harris knew that the District was overspending its fiscal year 2019 budget on salaries. CMA and Ganci knew the District was spending more than it brought in each year and Ganci had specifically identified the risk that the District's overspending could get worse. Further, the City, Brooks-Harris, CMA and Ganci all knew that the District had an enormous and unusual cash decline of $63 million as of the end of fiscal year 2019 that was due, in part, to increased spending on salaries. Despite this, they made no effort to investigate the extent of the overspending and made no effort to inform

investors of the risks the overspending posed to the District's finances or the City's finances.

7.      As a result of the misleading statements and omissions discussed herein, the City's offering documents concealed from investors the District's true financial condition at the time of the offering.  When the District's budget shortfall was finally revealed, the City's long-term credit rating declined from "Aa3" to "A2" and received a "negative outlook."

8.      Separately, CMA, Ganci, and CMA's other principal Richard Tortora ("Tortora") also failed to disclose to nearly 200 CMA clients (including the City) that CMA had material conflicts of interest arising from its compensation arrangements.  In many cases, CMA, Ganci and Tortora falsely stated that CMA had no undisclosed material conflicts of interest.

9.      By their conduct, Defendants Rochester, Brooks-Harris, CMA and Ganci violated, and/or aided and abetted violations of, the antifraud provisions of the federal securities laws, and Defendants CMA, Ganci and Tortora breached their fiduciary duty under the federal securities laws and violated, and/or aided and abetted violations of, the rules of the Municipal Securities Rulemaking Board ("MSRB").

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities") [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], and Sections 21(d), 21(e), 21(f) and 27 of the Securities Exchange Act of 1934 ("Exchange") [15 U.S.C. §§ 78u(d), 78u(e), 78u(f), 78aa].

11.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  For

example, as part of the acts described herein, the Defendants sent numerous emails and other electronic communications to each other.

12.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Specifically, the City is located within this district, Brooks-Harris is a resident of this district, and CMA, Ganci and Tortora engage in municipal advisory activity within this district.

**DEFENDANTS**

13.     **City of Rochester, New York** is a municipality located in Monroe County.  It is governed by an elected Mayor and nine-member City Council.  It is both a "municipal entity" and an "obligated person" as those terms are defined in Section 15B(e)(8) and 15B(e)(10) of the Exchange Act [15 U.S.C. §§ 78o-4(e)(8) and (10)].

14.     **Rosiland Brooks-Harris** resides in Rochester, New York.  She served as the Director of Finance of the City from June 30, 2018 to December 31, 2021.

15.     **Capital Markets Advisors, LLC** is a New York limited liability company with its principal place of business in Great Neck, New York.  CMA has been registered as a municipal advisor with the Commission since September 2014 and with the MSRB since 2014.

16.     **Richard Ganci** resides in Buffalo, New York.  He has served as an Executive Vice President and Principal at CMA since March 2005.  Ganci works from CMA's Orchard Park, New York office, where he engages in municipal advisory activities.  He is a municipal advisor and an associated person of CMA, as

those terms are defined by Section 15B(e)(4)(A) and 15B(e)(7) of the Exchange Act [15 U.S.C. §§ 78o-4(e)(4)(A) and (e)(7)] and MSRB Rule D-11.

17.    **Richard Tortora** resides in Manhasset, New York.  He has served as President and Principal at CMA since 2002.  He is a municipal advisor and an associated person of CMA, as those terms are defined by Section 15B(e)(4)(A) and 15B(e)(7) of the Exchange Act [15 U.S.C. §§ 78o-4(e)(4)(A) and (e)(7)] and MSRB Rule D-11.

## RELEVANT ENTITY

18.    **The District** is a New York public school district located in the City of Rochester that serves approximately 30,000 students.  It is governed by a seven-member elected Board of Education (the "Board").  The District is dependent upon the City to issue debt and to levy taxes on its behalf.  The District operates on a July 1 to June 30 fiscal year.

## FACTS

### I.    The City Sold the Notes in August 2019

19.    In August 2019, the City sold a $68,905,000 bond anticipation note ("BAN") and a $50,000,000 revenue anticipation note ("RAN").  Both notes were general obligations of the City, the payment of which was secured by the City's faith and credit.

20.    The stated purpose of the BAN was to provide financing for the District, as well as other City projects, and the stated purpose of the RAN was to provide cash flow financing for the District for fiscal year 2020.  Because the District was the expected source of the repayment of the RAN and because the District is the largest component of the City's overall budget, the District's financial condition was important to investors in both the RAN and the BAN.

21.    Brooks-Harris managed the City's bond program and oversaw the offering of the notes and the preparation of offering documents, including a

Preliminary Official Statement ("POS"), a Supplemented Preliminary Official Statement ("Supplemented POS"), and a Final Official Statement ("Final OS") (collectively, the "Offering Documents").

22.    Brooks-Harris reviewed, edited and ultimately signed the Offering Documents on behalf of the City.  She also reviewed and signed two closing certificates attesting to the accuracy of the Offering Documents.

23.    CMA and Ganci facilitated the bond offering process for the City. Among other things, they prepared the Offering Documents.  Under CMA's municipal advisory contract with the City, CMA was required to prepare the Offering Documents and to participate in all working group meetings and conference calls to "help ensure compliance with the legal requirements" of a note issuance.  CMA's contract also required CMA to "advise on and coordinate the credit rating process," including addressing any questions the rating analyst may have.

24.    CMA was paid a fee for each note issue under its contract with the City.  CMA's compensation was dependent on the issuance of the note, and the City paid for CMA's compensation with proceeds raised from the note issuance.

## II.    The District's Financial Condition Was Deteriorating

25.    The District's fund balances (differences between assets and liabilities) indicate its ability to address future unexpected financial challenges and are a primary metric used to analyze the District's financial health.  Between 2014 and 2018, total fund balance in the District's General Fund declined by over $27 million (from $77,139,826 to $49,636,366) due to recurring operating deficits.

26.    The District also had an internal "reserve policy" which required it to preserve a portion of its fund balance to address future unexpected financial challenges.  According to its policy, the General Fund was required to maintain committed, assigned and unassigned fund balances (subcategories of total fund

balance) between 5% and 15% of operating expenses. Notwithstanding the decline in total fund balance between 2014 and 2018, the District remained within its reserve policy as of the end of fiscal year 2018, and in February 2019, a credit rating agency stated that "fiscal 2019 [wa]s trending positively for both the city and the [District]."

27.     For fiscal year 2019, the District's adopted budget included the use of $15 million in fund balance to cover operating deficits. However, by November 2018, the District's overspending was accelerating. The bulk of the overspending was to cover teacher salaries. The District experienced a $63 million cash decline during fiscal year 2019 due, in part, to the District's overspending. This was an unusually large decline in cash compared to prior years. To pay expenses, the District increasingly began to rely on the City for short-term loans.

### A.     By July 2019, the City and Brooks-Harris Had Knowledge of the District's Financial Problems

28.     Because the District was requesting short-term loans from the City on a more frequent basis, Brooks-Harris and other City executives began meeting weekly with the District's finance staff to discuss the District's cash flow issues. Through those meetings and through weekly cash flow statements which District staff provided to her, Brooks-Harris became aware of the District's overspending in fiscal year 2019, and that the overspending was due to increases in teacher salaries. Prior to the note offering, Brooks-Harris was also aware of the District's $63 million decline in cash in fiscal year 2019.

29.     Through her position as City Finance Director and her role as head of the City's bond program, Brooks-Harris had the ability to request from the District any other financial information necessary to facilitate the City's bond offering on the District's behalf.

30.     In or around the spring of 2019, Brooks-Harris and the City decided that, instead of continuing to provide the District with short-term loans, the City would issue a RAN for the District to cover its cash flow deficits in fiscal year 2020.  The City had not issued a RAN on behalf of the District since 2004.

**B.     Ganci and CMA Had Knowledge of the District's Financial Problems Prior to the Offering**

31.     At the time of the bond offering, Ganci and CMA had served as the City's municipal advisor for over 10 years (since 2008), and Ganci was personally familiar with the City and the District's finances.

32.     Beginning in November 2018, Ganci began discussing the District's cash flow problems with Brooks-Harris and the possibility of issuing a RAN. Ganci knew the District's fund balance was decreasing over the most recent fiscal years due to its overspending, and was aware that a RAN issuance by the City on behalf of the District would be considered unusual and was likely to generate questions about the need for a RAN at this time.  As a result of his conversations with the City and Brooks-Harris, Ganci understood that the reason the City was issuing the RAN was, in substantial part, because of the District's overspending.

33.     Ganci was also aware of the District's unusual $63 million decline in cash.  On July 23, 2019, a potential investor who received the POS requested information about the District's 2019 fiscal year cash flow.  The POS at that time only contained the District's projected fiscal year 2020 cash flow statement.

34.     In response, Ganci advised the City to amend the POS to include the District's actual cash flow statement for fiscal year 2019.  That cash flow statement in the Supplemented POS showed the $63 million decline, which was significant compared to prior years.

35.     The City told Ganci that the $63 million decline was partly due to the addition of staff at the District.  Despite this additional knowledge of financial

distress, Ganci did not seek, or advise the City to seek, any additional information about the District's finances prior to the offering.

### III. Defendants' Materially Misleading Statements and Omissions to Credit Rating Analyst About the District's Financial Distress

36.     Prior to the bond offering, the City requested credit ratings for the notes, as it typically did with its bond offerings.  Credit ratings provide investors with an assessment of the creditworthiness of an issuer or financial instrument. The credit rating analyst typically reviews the financial statements and other relevant information to determine what rating to assign.

37.     The rating analyst for the City's bonds relied on the City and the District to provide accurate estimates for how their 2019 fiscal years would end. An important factor in the analyst's rating of the City's debt was whether the City and the District would end the 2019 fiscal year with a decrease in their fund balances or their liquidity.

38.     On the eve of a ratings call with the rating analyst, Ganci told Brooks-Harris that he suspected the District's structural cash issue might get worse "absent drastic changes."  Despite this, and his knowledge that the RAN was, in substantial part, prompted by the District's overspending and not merely timing differences, and his knowledge of the $63 million decline in cash at the District, Ganci made no effort to investigate, or advise the City to investigate, the extent of the District's financial problems.

39.     On July 11, 2019, Brooks-Harris, Ganci and other representatives from the City and the District met with the rating analyst to provide financial information about the District.

40.     In response to the rating analyst's questions regarding the purpose of the bond offering, Brooks-Harris and others from the District staff stated that the purpose of the RAN was merely to address a timing issue in the receipt of aid from

the State of New York.  They did not disclose the District's increased overspending on teacher salaries.

41.    In response to the rating analyst's questions regarding the District's expected use of $15 million in fund balance for fiscal year 2019 in light of the $63 million decline in cash, the District's then-CFO falsely represented that the District expected to use only $15 million in fund balance, which was substantially in line with its adopted budget.  He also falsely represented that the $63 million decline was due to accounting treatment and timing issues in the receipt of cash.  He failed to disclose that the District's actual expenses were trending significantly higher than the adopted budget, due in part to overspending on teacher salaries.  Brooks-Harris and Ganci heard the false representation to the rating analyst about the cash decline but did not correct it.  Brooks-Harris and Ganci also did not disclose the District's overspending on teacher salaries.

42.    Based in part on the misleading information provided by Brooks-Harris and District staff, on July 16, 2019, the credit rating agency assigned its highest short-term rating, "MIG 1," to the BAN and the RAN, and maintained its "Aa3" rating for the City's general obligation debt.

## IV.  Defendants' Materially Misleading Statements and Omissions in the Offering Documents

43.    On July 17, 2019 and July 24, 2019, the City disseminated the POS and the Supplemented POS, respectively, to investors.  On July 29, 2019, the City disseminated the Final OS to investors.

44.    The Offering Documents contained materially misleading statements and omissions.

45.    First, the financial information about the District in the Offering Documents was materially misleading because it provided an inaccurate and

outdated presentation of the District's financial condition at the time of the offering.

46.    The City included the District's audited financial statements for fiscal year 2018 in the Offering Documents.  By the time of the offering, however, those financial statements were over a year old, and did not reflect the fact that the District was experiencing a cash flow crisis as a result of overspending its 2019 budget.

47.    Second, although the Offering Documents included the 2019 cash flow statements showing the $63 million decline in cash, without further disclosure, a reader of the Offering Documents would not understand that the decline was due in substantial part to the District's rapidly increasing deficit and overspending.  To the contrary, in light of the stated purpose of the RAN, the more reasonable interpretation was that the decline was due merely to a mismatch in timing of State aid revenue (and would be resolved when the aid was received).

48.    Brooks-Harris and Ganci had the ability to request more current and accurate financial information from the District without extraordinary effort. Indeed, the District had previously provided this type of disclosure in other City bond offerings.  However, despite their awareness of the District's financial distress, Brooks-Harris and Ganci made no effort to further inquire about the District's financial condition prior to the bond offering.

49.    Third, the financial information about the District that was included in the Offering Documents was materially misleading because it contained no disclosure of the District's projected year-end financial results for fiscal year 2019. At the time of the offering, this information was known to the District and was available to the City, Brooks-Harris, CMA and Ganci.  The Offering Documents did not disclose that the District's overspending had accelerated, resulting in its increased reliance on the City for cash loans.  The Offering Documents also did not

disclose that overspending at this level would likely violate the District's reserve policy.

50.    Fourth, the statement in the Offering Documents that "Proceeds of [the] Revenue Anticipation Notes will be used to offset the effects of timing differences between cash receipts and disbursements in the 2019-2020 fiscal year" was materially misleading in light of the omitted information that the issuance of the RAN was prompted by the District's increased overspending and increasing need for cash.

51.    As discussed above, the District's need for cash and the decision to issue the notes related, in substantial part, to the District's accelerated overspending on teachers' salaries, resulting in an increasingly large budget deficit. Thus, the RAN was issued not only to address a mismatch of timing between expenditures and the receipt of State aid, as the statement in the Offering Documents indicated, but also to address the District's increasing spending.

52.    On July 25, 2019, the City offered and sold the BAN and RAN through a competitive sale.  On August 7, 2019, the bond deal closed and the City issued the notes.

## V.    In September 2019, an External Auditor Revealed the District's Substantial Budget Deficit, Leading to a Ratings Downgrade

53.    On September 18, 2019, less than two months following the issuance of the notes, the District's external auditor alerted District management that the District was facing a $30 million budget shortfall for fiscal year 2019.

54.    On September 26, 2019, the credit rating agency placed the City's credit ratings on review for possible downgrade, citing reports that the District incurred a nearly $50 million budget shortfall for fiscal year 2019 that "far exceeded [the credit rating agency's] expectations for declines to reserves [or fund balance]," which was $15 million.

55.     On October 3, 2019, the City filed a voluntary notice to investors on the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") system of a "discrepancy between financial information provided by the [District] to [the credit rating agency] and the estimated actual information subsequently received."

56.     On December 3, 2019, the District's external auditor completed its audit of the District's fiscal year 2019 financial report.  The audited financials revealed a $42 million operating deficit, or $27.6 million more in spending than had been budgeted, which consumed all of the District's "reserve policy" fund balance as well as $8.9 million of reserves restricted for other purposes.

57.     On December 9, 2019, the rating agency downgraded the City's long-term rating to "A2" and assigned a negative outlook.  It also downgraded the City's BAN to "MIG 2" but affirmed the "MIG 1" rating on the RAN based on the agency's rating methodology at the time.  In its credit opinion, the rating agency cited the decline in the District's fund balance by $42 million, which was approximately $30 million more than District management had projected during the July 11th ratings call.  "There is no clear explanation of how the July 2019 estimate was so far off," the rating agency wrote in its credit opinion.

58.     To address the District's budget shortfall, the State of New York granted the District a $35 million loan in May 2020, which is expected to be repaid over 30 years without interest.  In exchange for the loan, the State Commissioner of Education appointed a monitor to provide oversight of the District for a three year period beginning in May 2020.

## VI.     The District's Finances Were Important to Investors

59.     As alleged above, by the time of the offering, the District's financial condition had substantially worsened from what was reported in the 2018 financial statements attached to the Offering Documents.  This deterioration would have

been important for an investor to consider in deciding whether to purchase the notes, because the District was the largest component of the City's overall budget at the time of the note offering and was the expected source of repayment of the RAN. The deterioration would also have been important for an investor to consider in deciding whether to accept the price and yield being offered by the City, or whether a lower price and higher yield would be necessary to compensate for the increased repayment risk.

60.    Also as noted above, the credit rating agency downgraded the City's long-term debt rating and BAN rating upon learning of the District's decline in reserves and liquidity. Thus, the District's finances were important to the City's creditworthiness.

61.    The District's financial deterioration and the City's ratings downgrade impacted the City's borrowing costs in subsequent bond offerings. Following the disclosure of the true extent of the District's financial challenges and subsequent ratings downgrade, the City issued a revenue anticipation note in July 2020 that was significantly more expensive to the City than the RAN. For the RAN, the yield on the sale date was 12 basis points below the Municipal Market Analytics Inc. ("MMA") yield for that day. For the July 2020 note (after the disclosure), which was unrated, the yield was 34 basis points above the MMA yield. Thus, the City paid $345,000 more in interest for the 2020 RAN than would have been expected in the absence of the financial distress.

## VII.  Impact on Investors

62.    The materially misleading statements and omissions made by the City, Brooks-Harris, CMA and Ganci were harmful to investors. They concealed the District's true financial condition and concealed that the notes issued by the City had more risk than investors were led to believe. For example, as a result of the

misleading statements and omissions, investors did not know that the District was on track to completely consume its reserves in fiscal year 2019, limiting the District's liquidity and its ability to meet its financial obligations.

63.     Investors were forced to rely on outdated information when making their decision to purchase the City's notes at the then-prevailing price and yield. Moreover, investors relied on the City's credit ratings assigned at the time of the note offering, which were based on materially misleading information provided by the City, Brooks-Harris and District staff.

## VIII.  CMA, Ganci and Tortora Fail to Disclose Material Conflicts of Interests

64.     Separate from the allegations regarding CMA and Ganci's failure to disclose the District's financial distress, CMA, Ganci and CMA's other principal Richard Tortora failed to disclose material conflicts of interest to CMA's clients over a period of several years.

65.     A municipal advisor has a conflict of interest when its compensation is contingent on the size and/or closing of a client's transaction.  The conflict arises because, although the client has an interest in issuing as little debt as possible in order to satisfy its need for capital, the municipal advisor has an interest in increasing the size of the client's debt in order to increase its compensation. Similarly, a conflict of interest arises when compensation is contingent on the closing of a client's transaction, because although the client sometimes has an interest in declining to complete a transaction (such as issuing debt with unfavorable terms), the municipal advisor has an interest in completing the transaction in order to receive its compensation.

66.     A conflict arising from a municipal advisor's contingent compensation arrangement is material because a client or prospective client would reasonably consider the information important in making a decision about whether to engage a municipal advisor with a contingent compensation arrangement.

67.     A municipal advisor must disclose its material conflicts of interest prior to, or upon engaging, in municipal advisory activities.  Disclosure allows the prospective client (1) to make an informed decision about whether to hire the municipal advisor; (2) to be aware of the conflict of interest during the municipal advisory relationship; and (3) to consider the effect of the conflict of interest on any advice the municipal advisor provides the client.  Disclosure also allows the client to take, or ask the municipal advisor to take, steps to mitigate the conflict, or to negotiate a different form of compensation.

68.     CMA, Ganci, and Tortora failed to disclose to municipal advisory clients, including Rochester and nearly 200 other clients, CMA's material conflicts of interest arising from CMA's compensation arrangements that were contingent on the size and/or closing of the clients' bond offerings.

69.     CMA also failed to establish written supervisory procedures requiring the disclosure of all of CMA's material conflicts of interest to its clients, including those arising from CMA's contingent compensation arrangements, until November 2018.  Even after the procedures were established, Ganci and Tortora failed to implement or enforce those procedures.

70.     For example, the terms of a written agreement dated July 1, 2019 between CMA and an issuer client, and signed on behalf of CMA by Ganci, provided for CMA to receive compensation based on the size and the closing of the issuer's debt issuances.  Although the agreement had a section entitled "Required Regulatory Disclosure," CMA failed to disclose to its issuer client in that section or anywhere else in the agreement that the compensation arrangement created conflicts of interest for CMA.

71.     From 2017 through 2021, CMA, Ganci, and Tortora failed over 300 times to disclose to CMA's clients in writing that CMA had a material conflict of

interest arising from the fact that its compensation was contingent on the amount of debt issued by the client.

72.    During the same period, CMA, Ganci, and Tortora also failed nearly 400 times to disclose in writing to CMA's clients that CMA had a material conflict of interest arising from the fact that CMA would not be compensated for its work if the client's transaction did not close.

73.    Finally, during this same period, CMA, Ganci, and Tortora made written representations to clients nearly 300 times, in which they falsely stated that CMA had no undisclosed material conflicts of interest.

74.    For example, the terms of a written agreement dated July 6, 2021 between CMA and another issuer and signed on behalf of CMA by Tortora provided for CMA to receive compensation based on the size and the closing of the issuer's debt.  CMA did not disclose to this issuer client that this compensation arrangement created conflicts of interest for CMA.  On the contrary, CMA falsely stated in the agreement that "[t]o the best of our knowledge and belief, neither CMA nor any registered associated person has any material undisclosed conflict of interest that would impact CMA's ability to service [the issuer]."

## FIRST CLAIM FOR RELIEF

## Violation of Sections 17(a)(1) and (a)(3) of the Securities Act (against the City, Brooks-Harris, CMA and Ganci)

### Fraud in the Offer or Sale of Securities

75.    Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

76.    By reason of the foregoing, the City, Brooks-Harris, CMA, and Ganci directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly employed a device, scheme or artifice to

defraud, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

77.     By reason of the foregoing, the City, Brooks-Harris, CMA, and Ganci directly or indirectly violated and unless enjoined will continue to violate Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)].

## SECOND CLAIM FOR RELIEF

### Violation of Section 17(a)(2) of the Securities Act (against the City and CMA)

### Fraud in the Offer or Sale of Securities

78.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

79.     By reason of the foregoing, the City and CMA directly and indirectly, acting recklessly or negligently in the offer or sale of securities by use of the mails or the means or instruments of transportation or communication in interstate commerce have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

80.     By reason of the foregoing, the City and CMA directly or indirectly violated and unless enjoined will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

### (against Brooks-Harris and Ganci)

### Fraud in the Offer or Sale of Securities

81.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

82.     By reason of the foregoing, the City and CMA violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

83.     Brooks-Harris and Ganci, by their actions described above, knowingly or recklessly provided substantial assistance to the City's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

84.     Ganci, by his actions described above, knowingly or recklessly provided substantial assistance to CMA's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

85.     By reason of the foregoing, Brooks-Harris and Ganci directly or indirectly have aided and abetted and unless enjoined will continue to aid and abet violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

<u>FOURTH CLAIM FOR RELIEF</u>

<u>Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder</u>
<u>(against the City and Brooks-Harris)</u>

**Fraud in Connection with the Purchase or Sale of Securities**

86.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

87.     By reason of the foregoing, the City and Brooks-Harris directly or indirectly, by use of the instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have employed a device, scheme, or artifice to defraud; made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

88.     By reason of the foregoing, the City and Brooks-Harris directly or indirectly violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder (against CMA and Ganci)

### Fraud in Connection with the Purchase or Sale of Securities

89.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

90.     By reason of the foregoing, CMA and Ganci directly or indirectly, by use of the instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have employed a device, scheme, or artifice to defraud; and engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

91.     By reason of the foregoing, defendants CMA and Ganci directly or indirectly violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SIXTH CLAIM FOR RELIEF

### Violation of MSRB Rule G-17 (against CMA, Ganci and Tortora)

### Engaging in a Deceptive, Dishonest, or Unfair Practice

92.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

93.     Defendant CMA is a registered municipal advisor and Defendants Ganci and Tortora are associated persons of CMA.

94.     By reason of the foregoing, CMA, Ganci and Tortora have directly and indirectly, in the conduct of their municipal advisory activities, failed to deal fairly with all persons, and have engaged in a deceptive, dishonest or unfair practice, in violation of MSRB Rule G-17.

95.     By reason of the foregoing, CMA, Ganci and Tortora violated and unless enjoined will continue to violate MSRB Rule G-17.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

<u>**Violation of MSRB Rule G-42 (against CMA, Ganci and Tortora)**</u>

**Breach of Duties of Non-Solicitor Municipal Advisor**

96.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

97.     By reason of the foregoing, CMA and Ganci breached their duty of care to the City of Rochester, and CMA, Ganci and Tortora breached their duty of loyalty to their municipal entity clients.

98.     By reason of the foregoing, CMA, Ganci and Tortora violated and unless enjoined will continue to violate MSRB Rule G-42.

<u>**EIGHTH CLAIM FOR RELIEF**</u>

<u>**Violation of MSRB Rule G-42 (against CMA, Ganci and Tortora)**</u>

**Breach of Duties of Non-Solicitor Municipal Advisor**

99.     Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

100.    By reason of the foregoing, CMA, Ganci and Tortora failed to provide their municipal advisory clients full and fair disclosures in writing of all material conflicts of interest.

101.    By reason of the foregoing, CMA, Ganci and Tortora violated and unless enjoined will continue to violate MSRB Rule G-42.

## NINTH CLAIM FOR RELIEF

### Violation of MSRB Rule G-44 (against CMA, Ganci and Tortora)

**Supervisory and Compliance Obligations of Municipal Advisors**

102.   Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

103.   By reason of the foregoing, CMA, Ganci and Tortora failed to establish, implement, and maintain a system to supervise the municipal advisory activities of the municipal advisor and its associated persons that is reasonably designed to achieve compliance with applicable securities laws and regulations, including applicable MSRB rules.

104.   By reason of the foregoing, CMA, Ganci and Tortora violated and unless enjoined will continue to violate MSRB Rule G-44.

## TENTH CLAIM FOR RELIEF

### Violation of Section 15B(c)(1) of the Exchange Act (against CMA, Ganci and Tortora)

**Breach of Fiduciary Duty**

105.   Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

106.   Pursuant to Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)], a municipal advisor and any person associated with a municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom the municipal advisor acts as a municipal advisor, and no municipal advisor may engage in an act, practice or course of business that is not consistent with a municipal advisor's fiduciary duty.

107.   Defendant CMA acted as a municipal advisor and Defendants Ganci and Tortora acted as municipal advisors and persons associated with a municipal advisor, as those terms are defined in Sections 15B(e)(4)(A) and 15B(e)(7) of the

Exchange Act [15 U.S.C. §§ 78o-4(e)(4) and (e)(7)]. As such, CMA and Ganci owed a fiduciary duty to the City, and CMA, Ganci and Tortora owed a fiduciary duty to their other municipal entity clients.

108.   By reason of the foregoing, CMA, Ganci and Tortora engaged in the acts, practices and courses of business described above, and CMA, Ganci and Tortora breached their fiduciary duty to their municipal entity clients.

109.   By reason of the foregoing, CMA, Ganci and Tortora directly or indirectly violated and unless enjoined will continue to violate Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)].

## ELEVENTH CLAIM FOR RELIEF

## Violation of Section 15B(c)(1) of the Exchange Act (against CMA, Ganci, and Tortora)

### Acts in Contravention of Any Rule of the MSRB

110.   Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

111.   By reason of the foregoing, CMA, Ganci and Tortora violated MSRB Rules G-17, G-42, and G-44.

112.   By reason of the foregoing, CMA, Ganci and Tortora acted in contravention of a rule or rules of the MSRB while making use of the mails or any means or instrumentality of interstate commerce to provide advice to or on behalf of a municipal entity or obligated person with respect to municipal financial products or the issuance of municipal securities.

113.   By reason of the foregoing, CMA, Ganci and Tortora violated and unless enjoined will continue to violate Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)].

## TWELFTH CLAIM FOR RELIEF

### Alternative Liability

114.    Paragraphs 1 through 74 are hereby re-alleged and are incorporated herein by reference.

115.    As stated above, the SEC alleges that Brooks-Harris is liable for violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  However, to any extent that Brooks-Harris is not found liable for those violations, Brooks-Harris is liable for aiding and abetting the City's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

116.    By reason of the foregoing, the City violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

117.    By reason of the foregoing, Brooks-Harris, by her actions described above, knowingly or recklessly provided substantial assistance to the City's violations of Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

118.    As stated above, the SEC alleges that CMA and Ganci are liable for violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]. However, to any extent that CMA and Ganci are not found liable for those violations, CMA and Ganci are liable for aiding and abetting the City's and/or Brooks-Harris's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)

and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

119.   By reason of the foregoing, CMA and Ganci, by their actions described above, knowingly or recklessly provided substantial assistance to the City's and/or Brooks-Harris' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

120.   As stated above, the SEC alleges that Ganci and Tortora violated Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)] and MSRB Rules G-17, G-42, and G-44.  However, to any extent that Ganci and Tortora are not found liable for those violations, Ganci and Tortora are liable for aiding and abetting CMA's violations of Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)] and MSRB Rules G-17, G-42, and G-44.

121.   By reason of the foregoing, Ganci and Tortora knowingly or recklessly provided substantial assistance to CMA's violations of Section 15B(c)(1) of the Exchange Act [15 U.S.C. § 78o-4(c)(1)] and MSRB Rules G-17, G-42, and G-44.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants violated the federal securities laws and regulations alleged against them in this Complaint.

### II.

Issue a judgment permanently restraining and enjoining Defendants from directly or indirectly violating the federal securities laws and regulations alleged against them in this Complaint.

III.

Issue a judgment permanently restraining and enjoining Brooks-Harris from directly, or indirectly, (i) participating in any issuance, purchase, offer, or sale of municipal securities, as defined in Section 3(a)(29) of the Exchange Act [15 U.S.C. § 78c(a)(29)], including but not limited to engaging or communicating with a broker, dealer, municipal securities dealer, municipal advisor, bond insurer, nationally recognized statistical rating organization, investor, issuer or obligated person for purposes of issuing, purchasing, offering, or selling any municipal security; and (ii) participating in the preparation of any materials or information, which Brooks-Harris should reasonably expect to be submitted to the Municipal Securities Rulemaking Board's Electronic Municipal Market Access system in connection with an offering or a continuing disclosure obligation, or which Brooks-Harris should reasonably expect to be provided to investors in connection with any offering (including a private placement) of municipal securities, provided however, that such injunction shall not prevent Brooks-Harris from purchasing or selling municipal securities for her own personal account.

IV.

Order Brooks-Harris to provide a copy of the judgment by email or mail within 10 days of the entry of the judgment to any issuer of municipal securities or obligated person with which Brooks-Harris is employed as of the date of the entry of the judgment.

V.

Order all Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Order CMA to disgorge its ill-gotten gains it received directly or indirectly, plus prejudgment interest, as a result of the alleged violations pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)].

## VII.

Grant such other relief as this Court may deem just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: June 14, 2022                          Respectfully Submitted,


s/ Eugene N. Hansen
James M. Carlson
Eugene N. Hansen
U.S. SECURITIES AND
EXCHANGE COMMISSION
100 F St. NE
Washington, DC 20549
Tel: (202) 551-6091
hansene@sec.gov

*Attorneys for Plaintiff*
Securities and Exchange Commission