**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

           Plaintiff,

   vs.

CITY OF ROCHESTER, NEW YORK,
ROSILAND BROOKS-HARRIS,
CAPITAL MARKETS ADVISORS, LLC,
RICHARD GANCI, AND RICHARD
TORTORA,

         Defendants,

---

Case No. 22-cv-6273

Hon. Elizabeth A. Wolford

ANSWER OF DEFENDANTS
CAPITAL MARKETS ADVIORS, LLC,
<u>RICHARD GANCI AND RICHARD TOTORA</u>

      Defendants Capital Markets Advisors, LLC ("CMA"), Richard Ganci ("Ganci") and

Richard Tortora ("Tortora"), by and through their undersigned counsel, hereby answer the

Complaint filed by Plaintiff Securities and Exchange Commission as follows:

<u>GENERAL DENIAL</u>

      Pursuant to Fed. R. Civ. P. 8(b), except as specifically identified below, CMA, Ganci and

Tortora generally deny each and every allegation in the Complaint, including any and all

allegations that any of them engaged in any wrongful conduct, and they each deny that they have

any liability in this matter. CMA, Ganci and Tortora have acted with honesty, integrity and good

faith at all times, and they specifically deny any allegation to the contrary. In particular, CMA

and Ganci have faithfully served as municipal advisor to the City of Rochester for many years

and always provided financial advice that served the best interests of the City. CMA and Ganci

diligently provided those services to the City of Rochester and never had any reason to believe that any financial information provided by the Rochester City School District ("RCSD"), an independent government entity, in connection with any note offering by the City was false or misleading in any way.

Moreover, CMA, Ganci, and Tortora never entered into any compensation arrangements for municipal advisory services that created any material conflicts of interest. CMA, Ganci and Tortora never received compensation from any person other than CMA clients and the amount of that compensation paid by CMA clients was always described in writing and fully understood by all CMA clients. Based upon these facts, CMA accurately represented to clients that CMA did not have any undisclosed compensation arrangements that created any material conflicts of interest.

Where the allegations in the Complaint are not directed at CMA, Ganci or Tortora, no response is required and no response has been provided below. Any lack of response should not be construed as an admission by CMA, Ganci or Tortora that the facts alleged or the characterizations asserted in those paragraphs are accurate.

## SPECIFIC RESPONSES TO INDIVIDUAL ALLEGATIONS

1.      Deny the allegations contained in paragraph 1 except admit: (a) on August 7, 2019, the City sold the following general obligation notes: (i) $68.905 million in Bond Anticipation Notes ("BAN"); and (ii) $50 million in Revenue Anticipation Notes ("RAN"); (b) Rosiland Brooks-Harris served as the City's Director of Finance at the time the City sold those notes; and (c) the purpose of the $50 million RAN was to finance cash flow requirements for the RCSD while it waited to receive various forms of funding from the State of New York (as stated in the City's RAN ordinance adopted by the City Council on June 18, 2019).

2.      Deny the allegations contained in paragraph 2 except admit: (a) the Official Statement concerning the $50 million RAN issued by the City, dated July 25, 2019 (the "OS") included the accurate representation that the proceeds of the $50 million RAN "will be used to offset the effects of timing differences between cash receipts and disbursements in the 2019-2020 fiscal year"; and (b) the OS accurately represented that the proceeds from the $69.9 million BAN "will provide original ($28,975,000) and renewal ($39,930,000) financing" and "shall be applied to finance water supply facilities ($5,359,000), local works ($1,281,000), parking ($1,821,000), library ($266,000), Refuse ($3,999,000), War Memorial ($471,000), School ($37,850,000), and general City purposes including street construction and reconstruction ($17,858,000)."

3.      Deny the allegations contained in paragraph 3 except admit: (a) the OS was prepared by the City, with the assistance of Woods Oviatt Gilman LLP ("Woods Oviatt"), legal counsel to the City, and CMA, municipal advisor to the City; (b) both Brooks-Harris and Ganci participated in the preparation of the OS; (c) financial statements for both the City and the RCSD were included in the OS; (d) the full faith and credit of the City was pledged to the payment of principal and  interest on the $50 million RAN; and (e) the RCSD was expected to repay to the City all cash flow financing provided by the City to the RCSD during the 2019-2020 fiscal year. In further response to the allegations contained in paragraph 3, the RCSD is an independent government entity from the City, the financial operations of the RCSD are not part of the City's budget, and the City must approve the annual budget adopted by the RCSD.

4.      Deny the allegations contained in paragraph 4 except admit: (a) the OS contained the most recent available financial statements for both the City and the RCSD; (b) Everton Sewell ("Sewell"), the RCSD's Chief Financial Officer, represented in a conference call that

included a credit rating agency representative in July 2019 that the RCSD had met its budget for the fiscal year that had ended on June 30, 2019; and (c) during that same conference call, Sewell explained why the RCSD's cash position had declined significantly during the fiscal year that ended on June 30, 2019.

5.     Deny the allegations contained in paragraph 5 except admit: (a) the RCSD had spent more on teacher salaries and certain other expense categories during the fiscal year ended June 30, 2019 than had been authorized in the RCSD budget; (b) on September 19, 2019, the RCSD notified the New York State Board of Regents that the 2018-19 audit reconciliation included preliminary findings that the RCSD had overspent its budget for that year "in certain areas, such as increased health insurance costs due to our status as being self-insured and rising costs for required special education services and staff."; (c) the unplanned operating deficit for the RCSD during 2018-19 amounted to $27.4 million; (d) the State of New York advanced $35 million in State aid to the RCSD during the 2019-20 fiscal year; (e) in May 2020, the State of New York appointed Shelley Jallow to serve as Academic and Fiscal Monitor to the RCSD; and (f) in December 2019, Moody's downgraded the City's credit rating and, beginning in July 2020, Moody's has repeatedly upgraded the City's credit rating.

6.     Deny the allegations contained in paragraph 6 except admit: (a) the RCSD published, approved budgets for 2017-18 and 2018-19 plainly stated that the RCSD expenditures for those years would exceed revenues and the difference would be paid from reserve funds maintained by the RCSD; (b) Ganci had described this use of reserve funds to meet operating expenses as a risk that needed to be addressed; and (c) in July 2019, the RCSD reported and explained a $63 million decline in cash during the 2018-19 fiscal year to the City, CMA and Moody's, none of which had reason to disbelieve the information provided by the RCSD.

7.      Deny the allegations contained in paragraph 7 except admit: (a) the cash flow statement for the 2018-19 fiscal year provided by the RCSD for inclusion in the OS did not accurately report actual revenues and expenditures for that fiscal year as determined by the subsequent audit of the RCSD's financial statements; and (b) in December 2019, Moody's downgraded the City's credit rating from "Aa3" to "A2" and assigned a "negative outlook" to the City.

8.      Deny the allegations contained in paragraph 8 except admit that CMA has accurately represented to clients that CMA did not have any undisclosed material conflicts of interest because no material conflicts of interest existed.

9.      Deny the allegations contained in paragraph 9.

10.     The allegations in Paragraph 10 constitute legal assertions as to which no response is required.

11.     The allegations in Paragraph 10 constitute legal assertions as to which no response is required.

12.     The first sentence of paragraph 12 constitutes legal assertions as to which no response is required. With respect to the second sentence of paragraph 12, CMA, Ganci and Tortora: (a) deny knowledge or information sufficient to admit or deny whether Brooks-Harris resides within the Western District of New York ("WDNY"); (b) admit that the City is located within WDNY; and (c) admit that CMA and Ganci have provided municipal advisory services to clients in the WDNY.

13.     Admit the allegations contained in paragraph 13.

14.     Deny knowledge or information sufficient to admit or deny the allegations contained in paragraph 14 except admit that Brooks-Harris served as the City's Director of Finance from July 2018 through December 2021.

15.     Admit the allegations contained in paragraph 15.

16.     Admit the allegations contained in paragraph 16.

17.     Admit the allegations contained in paragraph 17.

18.     Admit the allegations contained in paragraph 18 except deny that the RCSD "is dependent on the City to issue debt and to levy taxes on its behalf."

19.     Admit the allegations contained in paragraph 19.

20.     Deny the allegations contained in paragraph 20 except admit: (a) the OS accurately described the purpose of the BAN as providing original and renewal financing for City projects such as water supply facilities and street construction/reconstruction as well as RCSD building projects; (b) the OS accurately described the purpose of the RAN as providing financing for the RCSD's cash flow requirements during the 2019-20 fiscal year pending receipt of New York State aid to be receiving during the same fiscal year; and (c) the RCSD was expected to repay the cash flow advances provided by the City during the 2019-20 fiscal year.

21.     Deny the allegations contained in paragraph 21 except admit that Brooks-Harris, as the City's Director of Finance, actively participated in the preparation of the OS and other offering documents and received assistance in the preparation of those documents from Woods Oviatt and CMA.

22.     Admit the allegations contained in paragraph 22.

23.     Deny the allegations contained in paragraph 23 except admit: (a) CMA and Ganci facilitated the note offering process for the City; and (b) CMA's municipal advisory contract

with the City required CMA to provide certain services to the City, as fully described in that contract.

24.     Admit the allegations contained in paragraph 24.

25.     Deny the allegations contained in paragraph 25 except admit: (a) the RCSD's General Fund balance declined from $77,139,826 as of June 30, 2014 to $49,636,366 as of June 30, 2018; (b) the RCSD used monies from its General Fund during the period from June 2014 to June 2018 to pay expenses incurred in the operation of the RCSD that the RCSD believed necessary for the education of the City's public school students; and (c) a municipality's fund balance is one metric that can be used to assess a municipality's financial health.

26.     Admit the allegations contained in paragraph 26.

27.     Deny the allegations contained in paragraph 27 except admit: (a) the RCSD 2018-19 budget, adopted in May 2018, included the use of $15 million from reserve funds to pay all required expenses expected to be incurred in that fiscal year; (b) the RCSD's operating account cash balances decreased by $63 million during the course of the 2018-19 fiscal year; and (c) this decrease was larger than prior fiscal years, Sewell explained the reason for the decline to the City, CMA and Moody's in July 2019 and neither the City, CMA or Moody's then had any reason to disbelieve Sewell's explanation for the decline in cash.

28.     Deny the allegations contained in paragraph 28 except admit: (a) Brooks-Harris and other City finance officials met regularly with RCSD finance officials during the 2018-19 fiscal year to discuss the RCSD's cash flow needs; and (b) Brooks-Harris became aware of both the decline in the RCSD's operating account cash balances prior to the note offering and Sewell's explanation for that decline.

29.     Deny knowledge or information sufficient to admit or deny the allegations contained in paragraph 29.

30.     Admit the allegations contained in paragraph 30.

31.     Deny the allegations contained in paragraph 31 except admit that, at the time of the note offerings in August 2019, Ganci and CMA had served as the City's municipal advisor for over 10 years (since 2008) and Ganci was personally familiar (in a general sense) with the financial history of the City and the RCSD.

32.     Deny the allegations contained in paragraph 32 except admit: (a) during the 2018-19 fiscal year, Ganci discussed with the City the possibility of issuing a RAN as one means of addressing the RCSD's cash flow needs; and (b) Ganci knew that the RCSD had elected to use reserve funds in prior fiscal years to pay expenses that the RCSD had determined were necessary for the education of the City's public school students.

33.     Admit the allegations contained in paragraph 33.

34.     Admit the allegations contained in paragraph 34.

35.     Deny the allegations contained in paragraph 35 except admit: (a) Ganci received information from both the City and the RCSD concerning the causes of the decline in operating account cash balances during fiscal year 2018-19; and (b) the explanation for the decline was credible based on all the facts known to Ganci at that time and, therefore, Ganci did not seek or advise the City to seek additional information concerning the financial condition of the RCSD at that time.

36.     Admit the allegations contained in paragraph 36.

37.     Deny knowledge or information sufficient to admit or deny the allegations contained in paragraph 37 except admit: (a) in general, rating analysts for municipal bonds rely

on financial information provided by municipalities; and (b) in general, changes in a

municipality's fund balances is a factor considered by ratings analysts.

38.     Deny the allegations contained in paragraph 38 of the complaint except admit: (a)

Ganci advised Brooks-Harris that the RCSD's recent, consistent use of reserve funds to pay

some operating expenses could be the subject of questions by the rating agency analyst; (b)

Ganci advised Brooks-Harris that "absent drastic changes", the RCSD's depletion of reserve

funds could get worse if the RCSD did not either reduce expenditures or find new or increased

sources of revenues; and (c) Ganci did not "investigate, or advise the City to investigate, the

extent of the [RCSD's] financial problems" at that time because Ganci did not believe, based on

all the facts available to him at that time, that the financial information provided by the RCSD

was false or misleading in any way.

39.     Deny the allegations contained in paragraph 39 except admit that, on July 11,

2019, Brooks-Harris, Ganci, Sewell and others participated in a conference call with a ratings

analyst and information about the RCSD's financial statements were discussed during that call.

40.     Deny the allegations contained in paragraph 40 except admit: (a) the purpose of

the RAN was accurately represented to the ratings analyst in the same manner as it was

accurately described in the OS and other offering documents; and (b) neither Sewell or any other

RCSD representative disclosed to the ratings analyst during the July 2019 call that the RCSD had

"increased overspending on teacher salaries."

41.     Deny the allegations contained in paragraph 41 except: (a) deny knowledge or

information sufficient to admit or deny whether Sewell made any intentional false

representations during the call with the ratings analyst; and (b) admit: (i) Sewell represented that

the RCSD expected to use only $10 million of its reserve funds to meet its 2018-19 fiscal year

expenditures; (ii) Sewell represented that the $63 million decline in cash was due to accounting treatment and timing issues in the receipt of cash; (iii) Sewell did not disclose during the call that the RCSD's "actual expenses were trending significantly higher than the adopted budget, due in part to overspending on teacher salaries"; (iv) Brooks-Harris and Ganci both heard and believed the information provided by Sewell; and (v) Ganci did not disclose the "overspending on teacher salaries" during the conference call because Ganci was not aware of any such "overspending."

42.     Deny the allegations contained in paragraph 42 except admit that, on July 16, 2019, Moody's assigned its highest short-term rating "MIG 1" to both the BAN and the RAN, and maintained its "Aa3" rating for the City's general obligation debt.

43.     Deny the allegations contained in paragraph 43 except admit: (a) the City disseminated a preliminary official statement ("POS") on July 27, 2019; (b) the City disseminated supplements to the POS on July 23, 2019 and July 24, 2019; and (c) on July 29, 2019, the City sent the OS, dated July 25, 2019, to the purchaser of the notes after all parties had signed off on the OS.

44.     Deny the allegations contained in paragraph 44.

45.     Deny the allegations contained in paragraph 45.

46.     Deny the allegations contained in paragraph 46 except admit: (a) the City included the RCSD's audited financial statements for the year ended June 30, 2018 in the OS; and (b) the RCSD's audited financial statements included in the OS necessarily did not include any information concerning the mid-2019 operating account cash balances held by the RCSD.

47.     Deny the allegations contained in paragraph 47.

48.     Deny the allegations contained in paragraph 48 except: (a) deny knowledge or information sufficient to admit or deny that Brooks-Harris: (i) had the ability to request more

current and accurate financial information from the [RCSD] without extraordinary effort; or (ii) made no effort to further inquire about the [RCSD's] financial condition prior to the note offering; and (b) admit that Ganci did not request additional information concerning the RCSD's financial condition or make further inquiries concerning the RCSD's financial condition because Ganci had no reason at that time to disbelieve the accuracy of the financial statements and information provided by the RCSD.

49.     Deny the allegations contained in paragraph 49 except admit: (a) the OS did not disclose "that the [RCSD's] overspending had accelerated, resulting in its increased reliance on the City for cash loans" because, if true, that fact was not known to the City or CMA; and (b) the OS did not disclose that "overspending at this level would likely violate the [RCSD's] reserve policy" because, if true, that fact was not known to the City or CMA.

50.     Deny the allegations contained in paragraph 50.

51.     Deny the allegations contained in paragraph 51.

52.     Admit the allegations contained in paragraph 52.

53.     Deny knowledge or information sufficient to admit or deny the allegations in paragraph 53.

54.     Admit the allegations contained in paragraph 54.

55.     Admit the allegations contained in paragraph 55.

56.     Deny knowledge or information sufficient to admit or deny the first sentence of paragraph 56. Admit the second sentence of paragraph 56.

57.     Admit the allegations contained in paragraph 57.

58.     Deny the allegations contained in paragraph 58 except admit: (a) the State of New York advanced $35 million in aid to the RCSD, which will reduce the amount of New York State

aid received by the RCSD over the next 30 years; and (b) in May 2020, the State of New York appointed an Academic and Fiscal Monitor for the RCSD.

59.     Deny the allegations contained in paragraph 59 except admit that the financial performance of the RCSD during the 2018-19 fiscal year was substantially worse than the prior fiscal year and that the audited financial statements for the 2018-19 fiscal year, completed in December 2019, showed a large operating deficit for that fiscal year and a substantial drop in reserve balances.

60.     Deny the allegations contained in paragraph 60 except admit that in December 2019, Moody's downgraded the City's long-term debt rating and the August 2019 BAN rating.

61.     Deny the allegations contained in paragraph 61 except to deny knowledge or information sufficient to admit or deny the allegations concerning market data published by Municipal Market Analytics, Inc.

62.     Deny the allegations contained in paragraph 62.

63.     Deny the allegations contained in paragraph 63.

64.     Deny the allegations contained in paragraph 64.

65.     Deny the allegations contained in paragraph 65.

66.     Deny the allegations contained in paragraph 66.

67.     Admit the allegations contained in paragraph 67.

68.     Deny the allegations contained in paragraph 68 except admit that CMA, Ganci and Tortora did not disclose that CMA's compensation arrangements created a material conflict of interest because, in fact, CMA's compensation arrangements were: (a) fully disclosed to, regularly requested by, in conformance with long-standing industry practices, and understood by all clients; and (b) did not create a material conflict of interest.

69.     Deny the allegations contained in paragraph 69.

70.     Deny the allegations contained in paragraph 70 except admit that CMA did not disclose that its compensation arrangement created a material conflict of interest because, in fact, the compensation arrangements with the issuer-client were: (a) fully disclosed to, regularly requested by, in conformance with long-standing industry practices, and understood by all clients; and (b) did not create a material conflict of interest.

71.     Deny the allegations contained in paragraph 71 except admit that CMA did not disclose to clients that its compensation arrangements created a material conflict of interest because, in fact, those compensation arrangements were: (a) fully disclosed to, regularly requested by, in conformance with long-standing industry practices, and understood by all clients; and (b) did not create a material conflict of interest.

72.     Deny the allegations contained in paragraph 72 except admit that CMA did not disclose to clients that its compensation arrangements created a material conflict of interest because, in fact, those compensation arrangements were: (a) fully disclosed to, regularly requested by, in conformance with long-standing industry practices, and understood by all clients; and (b) did not create a material conflict of interest.

73.     Deny the allegations contained in paragraph 73 except admit that CMA represented to clients that no undisclosed material conflicts of interest because, in fact, no undisclosed material conflicts of interest existed.

74.     Deny the allegations contained in paragraph 74 except admit: (a) CMA did not state to the issuer client that its compensation arrangement created a material conflict of interest because the compensation arrangement did not create a material conflict of interest; and (b) CMA represented to the issuer client that "[t]o the best of our knowledge and belief, neither

CMA nor any registered associated person has any material undisclosed conflict of interest that would impact CMA's ability to service [the issuer.]"

75.     In response to paragraph 75, repeat the above responses to paragraphs 1 through 74.

76.     Deny the allegations contained in paragraph 76.

77.     Deny the allegations contained in paragraph 77.

78.     In response to paragraph 78, repeat the above responses to paragraphs 1 through 74.

79.     Deny the allegations contained in paragraph 79.

80.     Deny the allegations contained in paragraph 80.

81.     In response to paragraph 81, repeat the above responses to paragraphs 1 through 74.

82.     Deny the allegations contained in paragraph 82.

83.     Deny the allegations contained in paragraph 83.

84.     Deny the allegations contained in paragraph 84.

85.     Deny the allegations contained in paragraph 85.

86.     In response to paragraph 86, repeat the above responses to paragraphs 1 through 74.

87.     Deny the allegations contained in paragraph 87.

88.     Deny the allegations contained in paragraph 88.

89.     In response to paragraph 89, repeat the above responses to paragraphs 1 through 74.

90.     Deny the allegations contained in paragraph 90.

91.     Deny the allegations contained in paragraph 91.

92.     In response to paragraph 92, repeat the above responses to paragraphs 1 through

74.

93.     Admit the allegations contained in paragraph 93.

94.     Deny the allegations contained in paragraph 94.

95.     Deny the allegations contained in paragraph 95.

96.     In response to paragraph 96, repeat the above responses to paragraphs 1 through

74.

97.     Deny the allegations contained in paragraph 95.

98.     Deny the allegations contained in paragraph 95.

99.     In response to paragraph 99, repeat the above responses to paragraphs 1 through

74.

100.    Deny the allegations contained in paragraph 100.

101.    Deny the allegations contained in paragraph 101.

102.    In response to paragraph 102, repeat the above responses to paragraphs 1 through

74.

103.    Deny the allegations contained in paragraph 103.

104.    Deny the allegations contained in paragraph 104.

105.    In response to paragraph 105, repeat the above responses to paragraphs 1 through

74.

106.    The allegations in Paragraph 106 constitute legal assertions as to which no

response is required.

107.    Admit the allegations contained in paragraph 107.

108.   Deny the allegations contained in paragraph 108.

109.   Deny the allegations contained in paragraph 109.

110.   In response to paragraph 110, repeat the above responses to paragraphs 1 through 74.

111.   Deny the allegations contained in paragraph 109.

112.   Deny the allegations contained in paragraph 109.

113.   Deny the allegations contained in paragraph 109.

114.   In response to paragraph 110, repeat the above responses to paragraphs 1 through 74.

115.   Deny the allegations contained in paragraph 115.

116.   Deny the allegations contained in paragraph 116.

117.   Deny the allegations contained in paragraph 117.

118.   Deny the allegations contained in paragraph 118.

119.   Deny the allegations contained in paragraph 119.

120.   Deny the allegations contained in paragraph 120.

121.   Deny the allegations contained in paragraph 121.

<u>AFFIRMATIVE DEFENSES</u>

1.   The Complaint fails to state a claim upon which relief may be granted.

2.   The Complaint fails to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

3.   The Complaint fails to plead scienter adequately.

4.   CMA and Ganci are not liable for violations of Sections 17(a)(1), (a)(2) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder,

or aiding and abetting any such violations because neither CMA nor Ganci: (a) made any false or misleading statement; (b) omitted to state any material fact when under a duty to speak; and (c) are not responsible in law or in fact for any alleged false or misleading statement or omission of material fact by others.

5.     MSRB Rule G-42 requires municipal advisors to disclose material conflicts of interest to municipal advisory clients. To the extent MSRB Rule G-42 affirmatively requires a municipal advisor to describe a contingent compensation arrangement to a client as creating a material conflict of interest despite the fact that the contingent compensation does *not* create a material conflict of interest for the municipal advisor based on the facts, MSRB Rule G-42 is arbitrary, capricious and unenforceable.

6.     The SEC's claims are barred, in whole or in part, on the grounds that it seeks to impose upon CMA, Ganci and Tortora obligations that are inconsistent with, or in excess of, those imposed by applicable law.

7.     The SEC's claims concerning alleged violations of MSRB Rules G-17, G-42 and G-44, as well as the SEC's claims under Section 15B(c)(1) of the Exchange Act, are barred because: (a) such MSRB rules are ambiguous and fail to provide fair warning and notice required by the Due Process Clause of the Fifth Amendment to the U.S. Constitution; and (b) as the violations of those rules are alleged by the SEC in this case, the rule of lenity requires dismissal of the claims.

8.     At all times described in the Complaint and with respect to all matters contained therein, CMA, Ganci, and Tortora acted in good faith, and did not know, and in the exercise of reasonable care could not have known, of any wrongful act alleged in the Complaint.

<u>JURY DEMAND</u>

CMA, Ganci and Tortora hereby demand a jury on all issues so triable.


WHEREFORE, defendants CMA, Ganci and Tortora respectfully request that this Court:

1.      Enter judgment in their favor;

2.      Award them attorneys' fees and costs incurred in this action; and

3.      Award them such other and further relief as this Court deems just and proper.


Dated: New York, New York
       August 15, 2022

                     SHER TREMONTE LLP


                     By:   /s/ Robert Knuts
                            Robert Knuts
                            Kathryn E. Ghotbi

                     90 Broad Street, 23rd Floor
                     New York, New York 10004
                     Tel: 212.202.2600
                     rknuts@shertremonte.com
                     kghotbi@shertremonte.com

                     *Attorneys for Defendants Capital Markets Advisors LLC, Richard Ganci, and Richard Tortora*