UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

    -v-

CITY OF ROCHESTER, NEW YORK,
ROSILAND BROOKS-HARRIS,
CAPITAL MARKETS ADVISORS,
LLC, RICHARD GANCI, AND
RICHARD TORTORA,

               Defendants.

_____

**DECISION AND ORDER**

6:22-cv-06273

## <u>INTRODUCTION</u>

The Securities and Exchange Commission ("SEC") brings this civil enforcement action against the City of Rochester, its former financial director, Rosiland Brooks-Harris (collectively, the "City Defendants"), and its municipal advisors, Capital Market Advisors, LLC, Richard Ganci, and Richard Tortora (collectively, the "CMA Defendants").[1]  (Dkt. 1).  As relevant here, the SEC alleges that Defendants made materially misleading statements and omissions in the offering documents used to sell roughly $119 million in municipal bonds to investors.  The City Defendants move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. 45).  The CMA Defendants move for partial

_____

[1]  The City Defendants and the CMA Defendants will collectively be referred to herein as "Defendants."

judgment on the pleadings.[2]  (Dkt. 47).  The Court heard oral argument on the motions on February 15, 2024, at which time it reserved decision.  (Dkt. 90).  For the reasons discussed below, both motions are denied.

## BACKGROUND

As required on a motion to dismiss, the Court treats the SEC's factual allegations as true and draws all inferences in its favor.

## I.      Relevant accounting principles

Municipalities organize their accounting on a fund basis.  *See* Government Accounting Standards Board (GASB) Cod. § 1100.102, https://gars.gasb.org (last visited March 2, 2024).  "Expendable assets are assigned to the various governmental funds according to the purposes for which they may or must be used; current liabilities are assigned to the fund from which they are to be paid; and the difference between governmental fund assets and deferred outflows of resources, and liabilities and deferred inflows of resources, the fund equity, is referred to as 'Fund Balance.'"  *Id.* at § 1300.102(a).  The fund balance is what would remain if all assets were used to satisfy all liabilities.  "A reasonable level of unrestricted, unappropriated fund balance provides a cushion for unforeseen expenditures or revenue shortfalls and helps assure that adequate cash flow is available to meet the cost of operations."  Off. of the N.Y. State Comptroller,

---

[2]      The sixth through eleventh claims, as well as a portion of the twelfth claim, in the complaint concern regulatory claims the SEC brings only against the CMA Defendants. (Dkt. 1 at ¶¶ 92-113, 120-21).  Those claims are the subject of separate cross-motions for summary judgment (Dkt. 77; Dkt. 78), argued the same day as the motions to dismiss.  A separate opinion addressing those motions will be issued in due course.

Local Government Management Guide: Reserve Funds, at 1 (Feb. 2022) ("OSC Local Government Management").[3]   "[A] positive current unrestricted fund balance" is considered a sign of good municipal financial health.   34 C.F.R. § 668.15(b)(9)(ii).   A budget deficit may be appropriately paid out of a municipality's fund balance, so long as the deficit amount does not exceed the fund balance amount.   GASB, Standards of Governmental Accounting and Financial Reporting, Standard 54 ¶ 16.[4]

## II.    Legal relationship between the City and the District

Under state law, the school district for each of the so-called "Big Five" cities (Buffalo, New York City, Rochester, Syracuse, and Yonkers) is a separate and distinct legal entity from the cities themselves.   *See* N.Y. Educ. Law § 2551; *Lanza v. Wagner*, 11 N.Y.2d 317, 326 (1962) (noting each district is "an independent corporation separate and distinct from the city, created by the State for the purpose of carrying out a purely State function"). "[M]unicipalit[ies] must make appropriations of money to run the schools," but once appropriated, how that money is spent is solely within the control of the school district. *Divisich v. Marshall*, 281 N.Y. 170, 173-74 (1939).   Each of the Big Five school districts prepare annual budgets that are then submitted to each city for approval.   *See* N.Y. Educ. Law § 2576(1); *see also id.* § 2576(2) (providing that in Rochester, such estimate shall be filed with the mayor).   The cities may adjust the amount allocated, as "[t]he city has the machinery for raising the money by taxation and must see that the total appropriations do

---

[3]     https://www.osc.ny.gov/files/local-government/publications/pdf/reserve-funds.pdf (last visited March 3, 2024).

[4]     https://gars.gasb.org/3061797/2147483364 (last visited March 3, 2024).

not exceed constitutional limitations." *Divisich*, 281 N.Y. at 174.  Once the budget is approved, districts possess complete discretion to spend more or less than the amounts allocated to each line item.  *Id*. at 174 ("As to when, how, and where the amounts placed at their disposal shall be disbursed, each [district] exercises an independent judgment, uncontrolled by and in no respect interfered with or influenced by the city authorities."). State law forbids a district from overspending its budget.  N.Y. Educ. Law § 2576(7) (a district "shall not incur a liability or an expense chargeable against the funds under its control or the city for any purpose in excess of the amount appropriated or available therefor or otherwise authorized by law"); *see also Fuhrmann v. Graves*, 203 A.D. 507, 509 (4th Dep't 1922) (a district "must confine its expenditures within the limit of appropriation for educational purposes").

## III.   Bond mechanics

Municipal bonds are used to provide cash to local government entities, including school districts.  The municipal bonds at issue here are short-term notes, intended to "bridge gaps between the periodic collection of governmental revenues (through taxes, fines, fees, etc.) and the more pressing spending demands placed upon local governments.  In effect, they are a means of smoothing out and maintaining local governmental tax flows."  Joel A. Mintz & Ronald A. Rosenberg, *Fundamentals of Municipal Finance* at 14 (2d Ed. 2019). Revenue anticipation notes, or RANs, "are issued in anticipation of sales taxes, rents, fees, charges, and other revenues other than real estate taxes."  *Id.*  Bond anticipation notes, or BANs, are "issued to provide short-term financing," usually in anticipation of the municipality securing more permanent financing in the future.  *Id.*

The Big Five districts cannot issue their own municipal bonds, but the Big Five cities may issue the bonds on behalf of the districts.  "The State Constitution prohibits the City from contracting any indebtedness unless it pledges its 'faith and credit' for the payment of the principal and interest on the debt."  *See Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*, 2 N.Y.3d 524, 539 (2004).  "The purpose of this provision is obvious—to ensure that the municipalities honor their legal financial obligations to their creditors."  *Id*.  A pledge of a city's "faith and credit" means "the issuing government pledges to use all available revenue sources that are available to it, including but not limited to tax revenues, to repay the principal and interest on the bonds in a timely manner."  *Fundamentals of Municipal Finance* at 8.

## IV.    The 2019 Bond Offering

The District's fund balance declined more than $27 million between 2014 and 2018, primarily due to operating deficits.  (Dkt. 1 at ¶ 25).  And for fiscal 2019 (July 1, 2018-June 30, 2019), the District's budget indicated that it intended to use an additional $15 million of reserves to offset expenditures.  (*Id.* at ¶ 27).   "However, by November 2018, the District's overspending was accelerating. The bulk of the overspending was to cover teacher salaries."  (*Id*.).  The District began turning to the City for short-term loans to meet its expenses.  (*Id*.).

Rosiland Brooks-Harris ("Brooks-Harris") and other City executives began meeting with the District's financial staff on a weekly basis "to discuss the District's cash flow issues."  (*Id*. at ¶ 28).  They also started receiving weekly cash flow statements from the District.  (*Id*.).  "Through those meetings and through weekly cash flow statements which

District staff provided to her, Brooks-Harris became aware of the District's overspending in fiscal year 2019, and that the overspending was due to increases in teacher salaries." (*Id.*).  "Prior to the note offering, Brooks-Harris was also aware of the District's $63 million decline in cash in fiscal year 2019." (*Id.*).  The District's financial condition led to the decision to issue the municipal bonds at issue here.  (*Id.* at ¶ 30).  Prior to this bond offering, the last time the City issued a RAN on behalf of the District was 2004.  (*Id.*).

As the City's director of finance, Brooks-Harris managed the City's bond offerings.  (*Id.* at ¶¶ 14, 21).  She oversaw the preparation of the offering documents for the RAN and the BAN, and signed the offering documents on behalf of the City.  (*Id.* at ¶¶ 21, 22).  She also "had the ability to request from the District any other financial information necessary to facilitate the City's bond offering on the District's behalf."  (*Id.* at ¶ 29).

CMA, as the City's municipal advisors, prepared the offering documents and bore responsibility for answering questions raised by the credit rating analyst.  (*Id.* at ¶ 23).  Richard Ganci ("Ganci") served as the City's advisor for a decade, and as such was familiar with the finances of both the City and the District.  (*Id.* at ¶ 31).  Ganci and Brooks-Harris started discussing the idea of issuing a RAN in November 2018.  (*Id.* at ¶ 32).  "Ganci knew the District's fund balance was decreasing over the most recent fiscal years due to its overspending, and was aware that a RAN issuance by the City on behalf of the District would be considered unusual and was likely to generate questions about the need for a RAN at this time."  (*Id.* at ¶ 32).

The City ultimately offered two bonds.  The first, a $68.9 million BAN, stated its purpose "was to provide financing for the District, as well as other City projects."  (*Id.* at

¶¶ 19-20).  The second, a $50 million RAN, stated its purpose "was to provide cash flow financing for the District for fiscal year 2020."  (*Id.*).

Before the sale, the City sought credit ratings for the bonds, which required both the City and District to provide the ratings analyst with an estimate of how the fiscal 2019 year would end.  (*Id.* at ¶¶ 36, 37).  Credit ratings "provide investors with an assessment of the creditworthiness of an issuer or a financial instrument."  (*Id.* at ¶ 36).  During a conversation the night before a call with the ratings analyst, Ganci told Brooks-Harris "that he suspected that the District's structural cash issue might get worse 'absent drastic changes.'"  (*Id.* at ¶ 38).

On July 11, 2019, Brooks-Harris, Ganci, and others from both the City and the District met with the ratings analyst.  (*Id.* at ¶ 39).  During that meeting, the analyst asked why the City was issuing the bonds, and Brooks-Harris and others told him that it was to smooth out a timing issue with regards to New York state aid.  (*Id.* at ¶ 40).  Nobody "disclose[d] the District's increased overspending on teacher salaries." (*Id.*).  The District's then-chief financial officer, Everton Sewell ("Sewell"), falsely told the analyst that the District only intended to use $15 million from the fund balance during fiscal 2019—a number that was consistent with the District's adopted budget.  (*Id.* at ¶ 41).  Also during that meeting, Sewell "falsely represented that the $63 million decline was due to accounting treatment and timing issues in the receipt of cash." (*Id.*).  "Brooks-Harris and Ganci heard the false representation to the rating analyst about the cash decline but did not correct it." (*Id.*).  Based in part on these alleged misrepresentations and omissions, the

ratings agency assigned both bonds its highest rating for short-term municipal bonds. (*Id*. at ¶ 42).

As the district's chief financial officer, Sewell "was in charge of the District's budget and financial reporting processes" and "was the primary communicator of the District's financial information to the [school] Board, the City, and the credit rating agencies." *SEC v. Sewell*, No. 6:22-cv-06274, Dkt. 1 ("Sewell Compl.") (W.D.N.Y. June 14, 2022). At the time Sewell was representing to the ratings analyst that the $63 million decline in cash would not affect the District's bottom line, Sewell knew "that the District's fiscal year 2019 budget was going to be overspent by at least $25 million and that this would, in turn, violate the District's reserve policy." (*Id.* at ¶ 18). The District's reserve policy called for maintaining a fund balance at a level "between 5% and 15% of operating expenses." (Dkt. 1 at ¶ 26). Reports provided to Sewell showed estimated deficits of between $25 million and $59 million to end the fiscal year, even as he "falsely represented that the District was on track to meet its 2019 budget and failed to disclose the projected overspending when asked by the credit rating analyst." (Sewell Compl. at ¶ 27). "Sewell did not inform anyone outside of the District's finance department of the project budget deficits until late August 2019, after the bonds had been issued." (*Id.* at ¶ 19).

The City sent out the offering documents to investors between July 17 and 29, 2019. (Dkt. 1 at ¶ 43). The initial offering documents did not contain information about the District's 2019 fiscal year cash flow. (*Id*. at ¶ 33). On July 23, 2019, a potential investor requested such information, and "Ganci advised the City to amend [the offering document] to include the District's actual cash flow statement for fiscal year 2019." (*Id*. at ¶ 34). The

supplemental offering documents showed the $63 million cash decline.  (*Id*.).  However, neither document reflected that a substantial reason for the cash decline was overspending, primarily on teacher salaries.  (*Id*. at ¶ 47).  Instead, an investor reading the offering documents would understand the only reason for the decline to be the result of a mismatch in the timing of aid from New York state.  (*Id*. at ¶¶ 47, 51).  But Ganci knew that "the $63 million decline was partly due to the addition of staff at the District."  (*Id*. at ¶ 35).  "Despite this additional knowledge of financial distress, Ganci did not seek, or advise the City to seek, any additional information about the District's finances prior to the offering."  (*Id*.).

The SEC alleges that the offering documents contained materially misleading statements and omissions:

1.  The financial information in the initial offering documents "was materially misleading because it provided an inaccurate and outdated presentation of the District's financial condition at the time of the offering."  (*Id.* at ¶ 45).  The offering documents included the audited financial statements for fiscal 2018, but did not include information related to fiscal year 2019, and thus "did not reflect the fact that the District was experiencing a cash flow crisis as a result of overspending its 2019 budget."  (*Id.* at ¶ 46).

2.  Even though the District issued supplemental offering documents that included the fiscal 2019 cash flow statements reflecting the $63 million cash decline, "without further disclosure, a reader of the Offering Documents would not understand that the decline was due in substantial part to the District's rapidly increasing deficit and overspending.  To the contrary, in light of the stated

purpose of the RAN, the more reasonable interpretation was that the decline was due merely to a mismatch in timing of State aid revenue (and would be resolved when the aid was received)."  (*Id*. at ¶ 47).  Brooks-Harris and Ganci did not make further inquiries into the District's finances prior to the Bond offering, despite the ability to do so.  (*Id*. at ¶ 48).

3.  The offering documents were "materially misleading because [they] contained no disclosure of the District's projected year-end financial results for fiscal year 2019."  (*Id*. at ¶ 49).  Despite the information being "known to the District and [] available to the City, Brooks-Harris, CMA, and Ganci," the "Offering Documents did not disclose that the District's overspending had accelerated, resulting in its increased reliance on the City for cash loans . . . [and] that overspending at this level would likely violate the District's reserve policy."  (*Id*. at ¶ 49).

4.  "[T]he statement in the Offering Documents that 'Proceeds of [the] [RAN] . . . will be used to offset the effects of timing differences between cash receipts and disbursements in the 2019-2020 fiscal year' was materially misleading in light of the omitted information that the issuance of the RAN was prompted by the District's increased overspending and increasing need for cash."  (*Id*. at ¶ 50).  "Thus, the RAN was issued not only to address a mismatch of timing between expenditures and the receipt of State aid, as the statement in the Offering Documents indicated, but also to address the District's increased spending."  (*Id*. at ¶ 51).

The District's finances were important to investors considering purchasing the City's bonds, "because the District was the largest component of the City's overall budget and was the expected source of repayment of the RAN." (*Id.* at ¶ 59). In addition, "[t]he deterioration [in the District's finances] would also have been important for an investor in deciding whether to accept the price and yield being offered by the City, or whether a lower price and higher yield would be necessary to compensate for the increased repayment risk." (*Id.*). "The materially misleading statements and omissions [by defendants] were harmful to investors," because "[t]hey concealed the District's true financial condition and concealed that the notes issued by the City had more risk than investors were led to believe." (*Id.* at ¶ 62).

The City offered and sold the bonds on July 25, 2019, and the sale closed on August 7, 2019. (*Id.* at ¶ 52). Roughly six weeks later, the District's external auditor informed District management that the District faced a $30 million shortfall for fiscal 2019. (*Id.* at ¶ 53). The City filed a "voluntary notice to investors on the Municipal Securities Rulemaking Electronic Municipal Market Access ('EMMA') system of a 'discrepancy between financial information provided by the [District] to [the credit rating agency] and the estimated actual information subsequently received.'" (*Id.* at ¶ 55). The ratings agency put the bonds on review for possible downgrade on September 26, 2019. (*Id.* at ¶ 54). It noted "reports that the District incurred a nearly $50 million shortfall for fiscal year 2019 that 'far exceeded [the credit rating agency's] expectations for declines to reserves [or fund balance],' which was $15 million." (*Id.*).

The final audit, released on December 3, 2019, showed a $42 million operating deficit, "$27.6 million more in spending than had been budgeted, which consumed all of the District's 'reserve policy' fund balance as well as $8.9 million of reserves restricted for other purposes." (*Id*. at ¶ 56). The ratings agency downgraded the rating for the BAN six days later, noting that there was "no clear explanation of how the July 2019 estimate was so far off." (*Id*. at ¶ 57). The rating on the RAN remained the same, "based on the sufficiency of cash flows, adequate management of its cash position despite recent declines, and moderate segregation of funds prior to note maturity." *Rating Action: Moody's downgrades Rochester, NY GO to A2 and BANs to MIG2, revises outlook to negative*, Moody's Investor's Service (Dec. 9, 2019) (Dkt. 45-4). Because the City and District's financial interests are closely related, the ratings agency also downgraded the City's long-term debt rating, increasing its future borrowing costs. (Dkt. 1 at ¶¶ 59-61).

## V.   Procedural History

The SEC filed the instant action on June 14, 2022. (Dkt. 1). At issue on the motions for judgment on the pleadings are the claims related to the alleged material misstatements and omissions involved in offering the bonds. The first claim, against both the City Defendants and CMA Defendants, alleges fraud in the offer or sale of securities in violation of sections 17(a)(1) and (a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a). (*Id*. at ¶¶ 75-77). The second claim, against the City and CMA, alleges fraud in the offer or sale of securities in violation of section 17(a)(2) of the Securities Act. (*Id*. at ¶¶ 78-80). The third claim, against Brooks-Harris and Ganci, alleges aiding and abetting fraud in the offer or sale of securities in violation of section 17(a)(2) of the Securities Act.

(*Id*. at ¶¶ 81-85).  The fourth claim, against the City and Brooks-Harris, alleges fraud in connection with the purchase and sale of securities in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.  (*Id*. at ¶¶ 86-88).  The fifth claim, against CMA and Ganci, alleges fraud in connection with the purchase or sale of securities in violation of section 10(b) of the Exchange Act and Rules 10b-5(a) and (c).  (*Id*. at ¶¶ 89-91).  The twelfth claim asserts, in part, negligence as an alternative ground for liability.  (*Id*. at ¶¶ 114-121).  The SEC seeks an injunction "permanently restraining and enjoining Defendants from directly or indirectly violating the federal securities laws and regulations alleged against them in this Complaint." (*Id*. at 25).  The SEC also seeks an injunction barring Brooks-Harris from participating in the "issuance, purchase, offer, or sale of municipal securities" other than for her own personal account, along with ordering all defendants to pay civil penalties and having CMA disgorge "ill-gotten gains." (*Id*. at 26).

The CMA Defendants answered on August 15, 2022.  (Dkt. 16).  The City Defendants answered on November 11, 2022.  (Dkt. 26).  The City Defendants filed the pending motion for judgment on the pleadings on April 14, 2023 (Dkt. 45), and the CMA Defendants filed the pending motion for partial judgment on the pleadings addressed to the non-regulatory claims on May 4, 2023 (Dkt. 47).  The SEC filed a memorandum in opposition to both motions on May 25, 2023 (Dkt. 53), and Defendants filed replies on June 16, 2023 (Dkt. 59; Dkt. 60).  The motions were argued on February 15, 2024, and the Court reserved decision.  (Dkt. 90).

**DISCUSSION**

I. **Legal Standard**

"The standard for reviewing a motion for judgment on the pleadings is the same as that for a motion to dismiss." *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023). The district court "must accept as true all well-pleaded factual allegations in the Complaint and [] draw all reasonable inferences in favor of the plaintiff." *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012). "A claim has facial plausibility when the plaintiff pleads actual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated by reference." *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 174 (2d Cir. 2021) (citation omitted). In deciding the motion, the court may consider documents incorporated by reference and any "matters of which judicial notice may be taken." *Apuzzo*, 689 F.3d at 207.

II. **Defendants' Motion for Judgment on the Pleadings**

The City Defendants primarily argue: (1) the SEC has failed to plausibly allege either scienter or negligence; and (2) the SEC failed to adequately plead scheme liability. (Dkt. 45-1 at 9-10). The CMA Defendants join in the arguments made by the City Defendants. (Dkt. 48 at 1). For the reasons discussed below, the Court is unpersuaded that the SEC's allegations are not sufficient to proceed at this stage of the litigation.

**A. Scienter**

"To state a claim on which relief can be granted under § 10(b) and Rule 10b-5, a plaintiff must plead, *inter alia*, that in connection with the purchase or sale of securities, the defendant made a false representation as to a material fact, or omitted material information, and acted with scienter." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009); *see also SEC v. Laura*, No. 18-cv-5075 (HG) (VMS), ___ F. Supp. 3d ___, 2023 WL 4238153, at *9 (E.D.N.Y. June 28, 2023) ("In order to show that a defendant is subject to misstatement liability under Section 10(b) and Rule 10b-5, the SEC must show that [a] defendant: (1) made a material misrepresentation or a material omission as to which he had a duty to speak . . .; (2) with scienter; (3) in connection with the purchase or sale of securities.") (quotation marks omitted).

The only element at issue on the pending motions is scienter. "Liability for securities fraud requires proof of scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (quotation marks omitted). A plaintiff must allege either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness" to survive a motion for judgment on the pleadings. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Here, the SEC argues that Defendants acted recklessly. (Dkt. 53 at 14).

Recklessness is "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have

been aware of it.'"  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Roth v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  "[T]he scienter element can be satisfied by a strong showing of reckless disregard for the truth."  *S. Cherry St.,* 573 F.3d at 109.  "By reckless disregard for the truth, we mean conscious recklessness—*i.e.*, a state of mind *approximating actual intent* and *not merely a heightened form of negligence*."  *Id.* (quotation marks omitted).  Such an inference is raised where the "complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud . . .; (2) engaged in deliberately illegal behavior. . .; (3) *knew facts or had access to information suggesting that their public statements were not accurate . . .*; or (4) *failed to check information that they had a duty to monitor*. . . ."  *Novak*, 216 F.3d at 311 (citation omitted) (emphasis added).

Defendants argue that the complaint fails to sufficiently plead scienter because it is undisputed that neither the City Defendants nor the CMA Defendants knew that Sewell was lying about the District's budget and fund balance.  (Dkt. 45-1 at 19).  Because the true secret was that the District illegally exceeded its budget for fiscal 2019—which the SEC does not allege Defendants were aware of—Defendants contend that the failure to disclose both reasons for the $63 million cash decline does not matter.  Relying on *Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996), Defendants argue that as a matter of law, it is not reckless for one entity to rely on the financial representations of another without further investigation.  (Dkt. 45-1 at 27).

The SEC argues that the complaint pleads Defendants knowingly made false and misleading statements, and thus adequately alleges scienter based on recklessness.  It

persuasively relies on *SEC v. City of Miami, Florida*, 988 F. Supp. 2d 1343, 1359-61 (S.D. Fla. 2013). In broad strokes, there the SEC alleged that the city of Miami, through its budget director, transferred monies into Miami's general fund to shore up the balance while knowing those monies were needed to fund ongoing projects. *Id.* at 1360. The SEC further alleged that "notwithstanding this knowledge [Miami] made misrepresentations to the rating agencies about the General Fund balance and omitted to disclose the transfers. The Complaint alleges [Miami] knew those misleading disclosures would affect the . . . financial statements relied on by purchasers of [Miami] debt. The Complaint alleges [Miami] moved the money into the General Fund with knowledge the rating agencies would look favorably upon the overstated General Fund account balance." *Id.* Taken together, the district court found the alleged misrepresentations sufficiently pleaded scienter. *Id.*

Similarly, here, the complaint alleges that the $63 million cash decline was due in large part to increased spending on teacher salaries, but the City Defendants omitted that fact, leaving potential investors with the impression that the decline was due to a timing issue with state aid. (Dkt. 1 at ¶ 47). The complaint further alleges that "Ganci knew the District's fund balance was decreasing over the most recent fiscal years due to its overspending . . . [and] [a]s a result of his conversations with the City and Brooks-Harris, Ganci understood that the reason the City was issuing the RAN was, in substantial part, because of the District's overspending." (*Id.* at ¶ 32). The complaint also alleges that accurate information about the District's finances was important to investors. (*Id.* at ¶¶ 59-61).

- 17 -

Reasonable minds may differ as to whether investors would care that there were two reasons for the $63 million cash decline—one being a timing issue regarding state aid and the other being a more structural issue regarding teacher salaries. But that question is not susceptible to decision on the pleadings. Drawing all inferences in the SEC's favor, the complaint sufficiently pleads scienter to survive a Rule 12(c) motion based on the failure to disclose overspending on teacher salaries as an additional reason for the need for the bonds and allowing the state aid timing issue to be the only apparent rationale. *See Novak*, 216 F.3d 311 (finding scienter adequately pleaded when plaintiff alleged that defendants "knew facts or had access to information suggesting that their public statements were not adequate"); *S. Cherry St.,* 573 F.3d at 110 (same); *see also SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) ("Representing information as true while knowing it is not . . . [is] sufficient to support a conclusion of scienter.").

The additional question of whether the complaint also adequately pleads scienter based on defendants "fail[ing] to check information that they had a duty to monitor," *South Cherry St.,* 573 F.3d at 110, is a close one. Defendants rely on *Chill*, where a broker for Kidder, Peabody & Co., a subsidiary of General Electric ("GE"), created a "scheme to generate false profits in order to increase his . . . bonuses." 101 F.3d at 265. The broker's scheme was "designed to be hidden from Kidder's management and auditors." *Id*. Plaintiffs alleged, in relevant part, that GE recklessly recorded profitable transactions that were false, because the record-high profits were a red flag that should have led GE to investigate. *See id*. at 266. The Second Circuit disagreed. "Given the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the

extraordinary success, of a subsidiary will not suffice in itself to state a claim that the parent was reckless in failing to further investigate." *Id.* at 270. "Fraud cannot be inferred simply because GE might have been more curious or concerned about the activity at Kidder." *Id.* Thus, "[i]ntentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls." *Id.* at 271 (citation omitted).

Defendants read *Chill* as creating a bright-line rule that as a matter of law, it "is not reckless for one entity to rely on the financial representations of another." (Dkt. 45-1 at 27). The Court is not convinced *Chill* stretches quite that far—*Chill* clearly notes that "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Id.* at 269. But because the Court finds the complaint adequately pleads scienter based on the alleged misstatements and omissions, the Court need not now resolve the issue of whether there were sufficient red flags regarding the District's finances to trigger a duty to investigate.

### B. Negligence

In the alternative, the complaint alleges that Defendants acted negligently in violation of Section 17(a)(2) of the Securities Act. (Dkt. 1 at ¶¶ 114-121). The elements of a section 17(a)(2) Securities Act violation are the same as a claim under section 10(b) of the Exchange Act, except that "[a] showing of negligence is sufficient" to satisfy the scienter element. *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

Of course, negligence requires a lesser showing of intent, so where, as here, a complaint adequately pleads scienter to satisfy the *mens rea* element, it necessarily adequately pleads negligence. *See SEC v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017)

("[B]ecause the Court finds that the SEC has properly plead[ed] the higher standard of scienter in connection with its misrepresentation claim, [defendant's] motion to dismiss the Section 17(a)(2) claim for a failure to plead negligence is denied."). However, for purposes of completeness, the Court addresses one point raised by Defendants in connection with the negligence claims.

Specifically, the City Defendants contend that the "SEC pleads itself out of court by alleging the City's separate reliance on its municipal advisor." (Dkt. 45-1 at 30, 31). They point to *SEC v. Westport Capital Markets LLC*, where the district court permitted such an argument to be presented to the jury. 613 F. Supp. 3d 643 (D. Conn. 2020). There, a district court allowed evidence that the defendants relied on the advice of a compliance officer on a showing that (1) "before taking action [the defendants] in good faith sought the advice of a person they believed to be a competent professional," (2) "consulted this professional for the purpose of securing advice on the lawfulness of their possible future conduct", (3) "made full and accurate report to that professional of all material facts that they knew", and (4) "then acted strictly in accordance with the advice of this professional." *Id.* at 648 (brackets omitted). The City Defendants argue the complaint here also pleads (1) that the City was advised by its "long-time municipal advisor," (2) that CMAs role was to "help ensure compliance with legal requirements," including "the credit rating process," (3) "that CMA was aware of the same facts known to the City, and (4) "that the city followed CMA's advice on those points, by disclosing the District's cash flow statements and not conducting further diligence." (Dkt. 45-1 at 30-31; Dkt. 1 at ¶¶ 3, 23, 32-33, 35, 39-41).

The City Defendants' arguments are unavailing at this stage in the litigation.  First, there are circumstances where a party satisfies the four elements of the defense and is found negligent regardless.  For example, in *SEC v. Jankovic*, the district court concluded that even assuming the defendant could satisfy all four elements of an advice-of-counsel defense, "[d]efendant cannot escape the conclusion that he acted negligently. Even armed with an attorney's advice, it is unquestionably negligent for the CEO of a company not to tell its biggest investor that only one-third of her money had been deposited in the company's accounts. Defendant's advice-of-counsel defense falls flat."  15 civ. 1248 (KPF), 2017 WL 1067788, at *17 (S.D.N.Y. March 21, 2017).  Second, the professional advice defense is a fact-intensive inquiry, ill suited to resolution on a Rule 12(c) motion. *See In re Reserve Fund Sec. and Derivative Litig.*, 732 F. Supp. 2d 310, 321 n. 8 ("The Second Circuit has held that where a defendant alleges that it acted in good faith and on advice of counsel, that defense generally presents a 'triable issue of fact.'").[5]

### C.  Scheme Liability

"Rule 10b-5 and Section 17(a), which largely mirror each other, both consist of a 'misstatement subsection' that is sandwiched between two 'scheme subsections.'"  *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022); *see also SEC v. Sason*, 433 F. Supp. 3d 496,

---

[5]     In their motion, the City Defendants argued that the complaint does not set out a negligence claim against Brooks-Harris.  (Dkt. 45-1 at 28).  The SEC responded that regardless of whether Brooks-Harris was named in the cause of action, it is clear from the factual allegations of the complaint that Brooks-Harris has fair notice of its claim, and thus it can proceed.  (Dkt. 53 at 20).  At oral argument, counsel for the City Defendants conceded the point.

508 (S.D.N.Y. 2020) ("Exchange Act § 10(b), Rule 10b-5(a) and (c), and Securities Act § 17(a)(1) and (3) create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct."). To state a claim for scheme liability, the SEC must allege that the defendant: "(1) committed a manipulative or deceptive act[,] (2) in furtherance of the alleged scheme to defraud, (3) [with] scienter." *Wey*, 246 F. Supp. 3d at 915-16 (brackets omitted). "The requisite scienter is intent to defraud or recklessness for each of the scheme liability provisions except Section 17(a)(3), for which a showing of negligence is sufficient." *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR), ___ F. Supp. 3d ___, 2023 WL 8944860, at *18 (S.D.N.Y. Dec. 28, 2023) (quotation marks omitted).

In *Rio Tinto*, the Second Circuit held that to state a claim for scheme liability, the SEC must allege conduct separate from the alleged misstatements or omissions that were the basis for primary liability under Rule 10b-5(b), that "something extra that makes a violation a scheme." 41 F.4th at 49. It reasoned that there must be some distinction between conduct that violates the first and third subsections of Rule 10b-5 and section 17(a) (the manipulative or deceptive act) and the second subsection of each (the material misstatement). *See id.* at 54 ("Were misstatements and omissions alone sufficient to constitute a scheme, the scheme subsections would swallow the misstatement subsections."). Thus, "misstatements and omissions can form *part* of a scheme liability claim but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination." *Id.*; *see also Lorenzo v. SEC,* 587

U.S. ___, 139 S. Ct. 1094, 1102 (2019) ("dissemination of false or misleading statements with intent to defraud" sufficient to trigger scheme liability).

The City Defendants argue that the SEC does not plead the "something extra" necessary to support a claim for scheme liability.  (Dkt. 45-1 at 31, 32).  The City Defendants argue that no misrepresentations were made, and that the SEC merely alleges that the statement regarding the reason for the RAN—the need to provide funding due to a timing issue with state aid—was "not false," just "incomplete."  (Dkt. 59 at 10).  That argument misses the mark—the incompletion is what the SEC alleges makes the statement misleading.  The SEC argues that it adequately pleaded dissemination by alleging: (1) the City Defendants disseminated the false statements in the offering documents sent to investors (Dkt. 1 at ¶¶ 43-52); (2) Brooks-Harris executed separate certifications attesting to the accuracy of the offering documents in furtherance of the scheme (Dkt. 1 at ¶ 22); and (3) the City Defendants facilitated the sale of the bonds  (Dkt. 1 at 21, 29-30, 44).  Drawing all inferences in the SEC's favor, this suffices to survive a Rule 12(c) motion.  *See Rio Tinto*, 41 F.4th at 53 (noting that "*Lorenzo* held that the transmission of emails, or 'dissemination,' could sustain a claim under the scheme subsections that prohibit a 'device,' 'scheme,' 'artifice to defraud,' and/or fraudulent 'practice.'").

### D. Aiding and Abetting

Finally, the City Defendants make a perfunctory argument that the complaint fails to adequately allege an aiding and abetting claim. (Dkt. 45-1 at 25).  "In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: (1) the existence of a securities law violation by the primary (as opposed to the

aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *Apuzzo*, 689 F.3d at 206. The City Defendants argue: (1) aiding and abetting liability attaches only to a person who acts "knowingly and recklessly," 15 U.S.C. § 77o; 15 U.S.C. § 77t, and that the complaint fails to plead such scienter; (2) the complaint fails to sufficiently allege an underlying securities law violation by the City; and (3) the complaint fails to adequately plead substantial assistance because it merely alleges that Brooks-Harris failed to correct Sewell's misstatements and does not charge her with making misstatements of her own. (Dkt. 45-1 at 32). The Court disagrees. As set out fully above, and again drawing all inferences in the SEC's favor, the Court finds that the complaint adequately pleads both the requisite scienter and that the City violated the securities laws by making misleading statements in the offering documents. Finally, the complaint adequately pleads that Brooks-Harris played a substantial role in putting together the offering documents and attested to their accuracy. (Dkt. 1 at ¶¶ 21, 22).

## CONCLUSION

For the foregoing reasons, the City Defendants' motion for judgment on the pleadings (Dkt. 45) and the CMA Defendant's motion for partial judgment on the pleadings (Dkt. 47) are denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 4, 2024
      Rochester, New York

- 24 -