UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

       v.

CITY OF ROCHESTER, NEW YORK,
ROSILAND BROOKS-HARRIS,
CAPITAL MARKETS ADVISORS,
LLC, RICHARD GANCI, and
RICHARD TORTORA,

               Defendants.

_____

**DECISION AND ORDER**

6:22-CV-06273 EAW

## <u>INTRODUCTION</u>

Plaintiff the Securities and Exchange Commission ("SEC") brings this civil enforcement action against the City of Rochester, the City's former financial director, Rosiland Brooks-Harris and its municipal advisors, Capital Market Advisors, LLC ("CMA"), Richard Ganci ("Ganci"), and Richard Tortora ("Tortora").[1] Municipal advisors are required to comply with the rules of the Municipal Securities Rulemaking Board ("MSRB"), and the SEC is charged with enforcing those rules. In the instant case, the SEC alleges that the CMA Defendants failed to comply with several MSRB rules, both in the bond offerings at issue in this litigation and in hundreds of similar transactions. The SEC seeks summary judgment as to liability on the regulatory claims alleged against the CMA

---

[1]      Ganci, Tortora and CMA will collectively be referred to herein as "CMA" or the "CMA Defendants."

Defendants in the sixth through twelfth causes of action set forth in the complaint, with remedies to be considered at a later point in time. (Dkt. 77; *see* Dkt. 77-1 at 6 n.1). The CMA Defendants move for summary judgment dismissing the same regulatory claims. (Dkt. 78).

Because the undisputed facts establish that the CMA Defendants failed to comply with the relevant MSRB rules and as a result breached their fiduciary duties, the SEC's motion for summary judgment is granted and the CMA Defendants' motion for summary judgment is denied.

## BACKGROUND

The parties stipulated to the relevant material facts. (Dkt. 74; Dkt. 75; Dkt. 76).[2] CMA is a registered municipal advisor. (Dkt. 74 at ¶ 1[3]). Ganci and Tortora are CMA's owners and principals. (*Id.* at ¶ 8). Both are advisors and associated persons of CMA within the meaning of sections 15B(e)(4)(A) and 15B(e)(7) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78o-4(e)(4)(A) and (e)(7). (*Id.* at ¶¶ 2, 4).

---

[2]     The Court allowed the sealing of certain information containing confidential and proprietary business fee information and compensation terms. (Dkt. 73). Consistent with that ruling, certain portions of the memoranda submitted by the parties in connection with their summary judgment motions (Dkt. 80; Dkt. 81; Dkt. 85), as well as certain exhibits (Dkt. 79), have been filed under seal. Because the information filed under seal does not need to be referenced in connection with resolution of the pending motions, the Court has referred to herein the unsealed, redacted papers filed in connection with the summary judgment motions.

[3]     The references to paragraph numbers in the stipulation filed at Docket 74 denote the numbered paragraphs beginning at page 3 of that document.

Tortora has served as president and a principal of CMA since 2002, and in that capacity signed hundreds of municipal advisory contracts on behalf of CMA between January 1, 2017 and December 31, 2022 (the "Relevant Time Period"). (*Id*. at ¶¶ 2, 9, 12; Dkt. 74-2 (setting out contracts signed by Tortora)). Tortora was responsible for negotiating and drafting contract terms for those agreements, which included making the required regulatory disclosures. (Dkt. 74 at ¶ 2). Tortora acted as CMA's chief compliance officer from January 2016 to April 2017. (*Id*. at ¶ 3).

Ganci, who joined CMA in 2005, became a principal in 2014 and executive vice president in May 2017. (*Id*. at ¶ 4). He signed dozens of municipal advisory contracts on behalf of CMA during the Relevant Time Period. (*Id*. at ¶¶ 4, 12; *see also* Dkt. 74-2 (setting out contracts signed by Ganci)). Ganci was responsible for negotiating and drafting contract terms, as well as making the required regulatory disclosures for those agreements. (Dkt. 74 at ¶ 4). Ganci acted as CMA's chief compliance office from September 2014 to December 2015. (*Id*. at ¶ 5).

Both Tortora and Ganci took and passed the MSRB Series 50 Examination in February 2016—a necessary prerequisite to becoming a municipal advisor representative—and the examination topics included the MSRB rules. (*Id.* at ¶ 6). Each also took and passed the MSRB Series 54 Examination, required before becoming a municipal advisor principal. (*Id*. at ¶ 7). The Series 54 Examination "measure[s] an individual's ability to apply the applicable regulatory requirements to the municipal advisor's activities." (*Id.*).

During the Relevant Time Period, CMA executed roughly 800 contracts with municipal entities for municipal advisory services in which CMA's compensation was dependent in whole or in part on the size of the debt issuance. (*Id.* at ¶¶ 9, 10; *see also* Dkt. 74-2 (summarizing municipal advisory contracts)). Most of the contracts also provide that CMA's compensation is dependent on the closing of the debt issuance—if the deal did not close, CMA did not get paid. (Dkt. 74 at ¶ 32). None of the municipal advisory contracts CMA entered into during the Relevant Time Period contained a disclosure that the contingent fee arrangement presented a material conflict of interest. (*Id.* at ¶ 14). The contracts are either silent on the issue, or represent that CMA had no material conflict of interest. (*Id.* at ¶¶ 15, 18).

In a December 2018 email blast sent to its clients, CMA included an attachment titled, "MSRB Rule G-42 Disclosure: Duties of Non-Solicitor Municipal Advisors." (*Id.* at ¶ 37; Dkt. 76-7). The email notes that Rule G-42 requires the disclosure of "any actual or potential material conflict of interest" and goes on to state: "[t]o the best of CMA's knowledge and belief, neither CMA nor any associated person has any material undisclosed conflict of interest." (Dkt. 76-7 at 3). In regard to contingency fee arrangements, the email states:

> CMA may have conflicts of interest arising from compensation for municipal activities to be performed that are contingent on the size or closing of such transaction for which CMA is providing advice. This potential conflict of interest exists if CMA should fail to get paid for its work on a transaction in the event that transaction does not close.

(*Id.*). No other communications regarding Rule G-42 were sent by CMA to its municipal entity clients, although certain municipal advisory contracts included language similar to

that in the email, and in 489 contracts CMA affirmatively represented that it had no material conflicts of interest.  (Dkt. 74 at ¶ 38).

Tortora and Ganci were aware of and reviewed Rule G-42 by its effective date in June 2016.  (*Id.* at ¶ 27).  "At all times relevant, in accordance with MSRB Rule G-42, Tortora and Ganci understood that CMA needed to disclose all actual and potential material conflicts of interest to CMA's municipal entity clients."  (*Id*. at ¶ 28).  Ganci testified that he understood that material conflicts of interest included conflicts arising from fee arrangements contingent on either the size or closing of a transaction.  (*Id.* at ¶ 30).

The SEC filed the instant action on June 14, 2022.  (Dkt. 1).  The CMA Defendants filed an answer on August 15, 2022.  (Dkt. 16).  The parties agreed to stipulate to the material facts, and discovery on the regulatory claims closed November 17, 2023.  (Dkt. 65).  The SEC and the CMA Defendants filed cross-motions for summary judgment as to the regulatory claims on December 15, 2023.  (Dkt. 77; Dkt. 78).  Both the SEC and the CMA Defendants filed memoranda in opposition to the respective motions on January 12, 2024.  (Dkt. 83; Dkt. 84).  The SEC sought leave, on consent, to file a reply memorandum to CMA's opposition to the SEC's motion, which was granted.  (Dkt. 86; Dkt. 87).  The SEC's reply memorandum was filed January 23, 2024.  (Dkt. 88).  The motions were argued February 15, 2024, and the Court reserved decision.  (Dkt. 90).[4]

---

[4]     Also argued on February 15, 2024, were motions for judgment on the pleadings by the CMA Defendants and the City of Rochester defendants.  (Dkt. 45; Dkt. 47).  This Court previously issued a Decision and Order on March 4, 2024, denying those motions.  (Dkt. 94).

## DISCUSSION

### I.   Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (quotation marks, internal citations, and footnote omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original). Where, as here, there are cross motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## II.   Cross-Motions for Summary Judgment regarding MSRB Rule G-42

The SEC argues that the stipulated facts demonstrate that the CMA Defendants failed to disclose actual and potential material conflicts of interest arising out contingent fee arrangements in contravention of MSRB Rule G-42(b)(i)(E).  (Dkt. 77-1 at 20-25).  In opposition, the CMA Defendants argue that the language of Rule G-42(b)(i)(E) requires disclosure of a material conflict of interest based on a contingency arrangement only when the municipal advisor determines such a conflict exists, not as a matter of course.  (Dkt. 84 at 7).  Alternatively, the CMA Defendants argue Rule G-42 is unenforceable to the extent it compels speech in violation of the First Amendment.  (*Id*. at 8).  In support of their motion for summary judgment, the CMA Defendants argue that because their contingency fee arrangements did not create an actual or potential conflict of interest, the stipulated facts demonstrate they did not violate Rule G-42(b)(i)(E).  (Dkt. 78-1 at 10-15).   In the alternative, they argue Rule G-42 fails to provide fair notice of its requirements in violation of the Due Process Clause.  (*Id*. at 15-16).

The cross-motions directed to MSRB Rule G-42 pertain to causes of action eight and eleven.  The eighth cause of action alleges the CMA Defendants violated MSRB Rule G-42 by failing to disclose all material conflicts of interest in writing.  (Dkt. 1 at ¶¶ 99-101).  The eleventh cause of action alleges the CMA Defendants violated section 15B(c)(1) of the Exchange Act by undertaking acts in contravention of any rule of the MSRB.[5]  (*Id*. at ¶¶ 110-113).

---

[5]      Section 15B(c)(1) of the Exchange Act provides in relevant part that "no municipal advisor may engage in any act, practice, or course of business which is not consistent with

The facts, as stipulated by the parties, demonstrate: (1) the CMA Defendants entered into more than 800 municipal advisory agreements where compensation was contingent, in whole or in part, on either the size or closing of a debt issuance (or both); and (2) prior to entering into said agreements, the CMA Defendants did not disclose to their clients that there was any material conflict of interest inherent in the contingency fee agreements. (Dkt. 74 at ¶¶ 9-10; Dkt. 74-2). For the reasons set forth below, the Court concludes that disclosure was required by MSRB Rule G-42(b)(i)(E), and the CMA Defendants failed to make the required disclosure.[6]  As a result, the Court grants the SEC summary judgment as to liability on the eighth and eleventh causes of action and denies the CMA Defendants' motion for summary judgment on those claims.

### A.    MSRB Rule G-42

Municipal advisors "provide[] advice . . . with respect to municipal financial products or the issuance of municipal securities, including advice with respect to the structure, timing, terms, and other similar matters concerning such financial products or issues." 15 U.S.C. § 78o-4(e)(4)(A)(i). Municipal advisors may also solicit business from municipal entities "on behalf of a broker, dealer, municipal securities dealer, municipal advisor, or investment adviser . . . that does not control, is not controlled by, or is not under

---

a municipal advisor's fiduciary duty or that is in contravention of any rule of the Board." 15 U.S.C. § 78o-4(c)(1).

[6]    The CMA Defendants cite to the December 2018 email blast as purportedly complying with the disclosure obligations of MSRB Rule G-42(b)(i)(E). (*See* Dkt. 84 at 4-5, 7). For the reasons discussed in Section IV of this Decision and Order, the Court disagrees.

common control with the person undertaking such solicitation. . . ."  *Id*. § 78o-4(e)(4)(A)(ii), (9).

The MSRB is "a self-regulating organization created by Congress in 1975, and supervised by the SEC, [and] is the primary regulatory authority in the municipal securities market."  *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 190 (2d Cir. 1998).  "The MSRB is authorized to propose and adopt rules to effectuate the purposes of the Exchange Act with respect to transactions in municipal securities."  *Id*.; *see* 15 U.S.C. § 78o-4(b)(2).  The MSRB's authority was originally limited to brokers and dealers, but the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 expanded the MSRB's regulatory authority to include municipal advisors.  2015 SEC Notice, 80 Fed. Reg. 81710 (Dec. 30, 2015); *see also* 15 U.S.C. §§ 78o-4(a)(5), (b)(2).

The Dodd-Frank Act stated that municipal advisors and their associated persons "shall be deemed to have a fiduciary duty to any municipal entity for whom such municipal advisor acts as a municipal advisor. . . ."  15 U.S.C. § 78o-4(c)(1).  The MSRB was to "propose and adopt rules" that "with respect to municipal advisors—(i) prescribe means reasonably designed to prevent acts, practices, and courses of business . . . not consistent with a municipal advisor's fiduciary duty to its and clients . . . [and] (iii) provide professional standards. . . ."  15 U.S.C. § 78o-4(b)(2)(L).

MSRB Rule G-42 went into effect on June 23, 2016.  (Dkt. 74 at ¶ 20).  "As described by the MSRB, Rule G-42 establishes core standards of conduct for municipal advisors that engage in municipal advisory activities."  (*Id*.).  MSRB Rule G-42 provides in relevant part:

(b) Disclosure of Conflicts of Interest and Other Information. *A municipal advisor must, prior to or upon engaging in municipal advisory activities, provide to the municipal entity or obligated person client full and fair disclosure in writing of:*

> *(i) all material conflicts of interest, including:*

>> (A) any affiliate of the municipal advisor that provides any advice, service, or product to or on behalf of the client that is directly related to the municipal advisory activities to be performed by the disclosing municipal advisor;

>> (B) any payments made by the municipal advisor, directly or indirectly, to obtain or retain an engagement to perform municipal advisory activities for the client;

>> (C) any payments received by the municipal advisor from a third party to enlist the municipal advisor's recommendation to the client of its services, any municipal securities transaction or any municipal financial product;

>> (D) any fee-splitting arrangements involving the municipal advisor and any provider of investments or services to the client;

>> *(E) any conflicts of interest arising from compensation for municipal advisory activities to be performed that is contingent on the size or closing of any transaction as to which the municipal advisor is providing advice*; and

>> (F) any other actual or potential conflicts of interest, of which the municipal advisor is aware after reasonable inquiry, that could reasonably be anticipated to impair the municipal advisor's ability to provide advice to or on behalf of the client in accordance with the standards of conduct of section (a) of this rule, as applicable.

If a municipal advisor concludes that it has no known material conflicts of interest based on the exercise of reasonable diligence by the municipal advisor, the municipal advisor must provide a written statement to the client to that effect.

MSRB Rule G-42(b) (emphasis added).[7]

The SEC argues that under the plain language of Rule G-42(b)(i)(E), contingency fee arrangements such as the ones CMA entered into must always be disclosed as material conflicts of interest.  (Dkt. 77-1 at 20).  CMA argues that the SEC misreads the rule.  (Dkt. 84 at 5).  Rule G-42(b)(i)(E), it argues, is best read to require the municipal advisor to determine "whether the specific fee arrangement in a specific contract actually creates a conflict of interest," and only if the municipal advisor determines such a conflict exists is disclosure required.  (*Id.*).

Neither party identified, nor did the Court find, any decisions interpreting the language of Rule G-42(b)(i)(E).  "Courts have often deferred to agencies' reasonable readings of genuinely ambiguous regulations, in what is commonly called *Auer* deference." *Walsh v. Walmart, Inc.*, 49 F.4th 821, 827 (2d Cir. 2023) (quotation marks omitted); *Kisor v. Wilkie*, ___U.S. ___, 139 S. Ct. 2400, 2408 (2019) (same).  However, a court need not resort to *Auer* deference "unless the regulation is genuinely ambiguous."  *Kisor*, 139 S. Ct. at 2415.  "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id*.

---

[7]     Paragraph .05 of the Supplementary Material of MSRB Rule G-42 provides as follows:  "Conflicts of Interest.  Disclosures of conflicts of interest by a municipal advisor to its municipal entity or obligated person client must be sufficiently detailed to inform the client of the nature, implications and potential consequences of each conflict.  Such disclosures also must include an explanation of how the municipal advisor addresses or intends to manage or mitigate each conflict."

The Court finds Rule G-42(b)(i)(E)'s language unambiguous, rendering *Auer* deference unnecessary. The language is susceptible to but one meaning: conflicts of interest arising from contingency fee arrangements based on the size or closing of the transaction are material conflicts of interest subject to mandatory disclosure. The regulation opens by stating that "[a] municipal advisor must, prior to or upon engaging in municipal advisory activities, provide to the municipal entity or obligated person client full and fair disclosure in writing of . . . all material conflicts of interest. . . ." MSRB Rule G-42(b)(i). It then lists different types of material conflicts of interest subject to disclosure, including "any conflicts of interest arising from compensation for municipal advisory activities to be performed that is contingent on the size or closing of any transaction as to which the municipal advisor is providing advice." MSRB Rule G-42(b)(i)(E). By its own terms, then, where "municipal advisory activities to be performed" are "contingent on the size or closing" of a transaction, it creates a "conflict[] of interest" and the nature of that conflict must then be disclosed.

The Court cannot accept the CMA Defendants' argument that subpart (E) "does not state that <u>all</u> contingent fee arrangements create a material conflict of interest," but "[i]nstead, it requires the municipal advisor to assess whether the specific fee arrangement in a specific contract actually creates a conflict of interest." (Dkt. 84 at 6). That interpretation is inconsistent with the plain language of the regulation, which sets out a list of fee arrangements considered material conflicts of interest subject to mandatory disclosure. The opening phrase in (b)(i)(E) of "any conflicts of interest arising from" does not, as CMA suggests, vest discretion with the municipal advisor to determine whether a

conflict exists.  Rather, the rule designates contingency arrangements based on the size or closing of a transaction as creating a material conflict, and requires the disclosure of any such conflict of interest.  This opening phrase makes sense in the context of contingency fee arrangements, which occur in more than one form.  Contingency fee arrangements may be related to the amount of the financing, for example, or tied to whether the deal closes, or both.  A fee arrangement contingent on the amount of the bond need only disclose the potential conflict arising out of that arrangement without unnecessarily suggesting that a conflict arises from any other non-contingent aspect of the fee arrangement.  Likewise, a fee arrangement contingent solely on the deal closing need only disclose the potential conflict arising out of that arrangement.  In other words, the contingency arrangements identified in Rule G-42(b)(i)(E), by definition, create material conflicts of interest according to the MSRB, and if such a contingency arrangement exists, the nature of those conflicts must then be disclosed.

There is no other reasonable interpretation of this provision—and CMA's suggestion that the rule leaves to the municipal advisor to determine whether a contingency agreement creates a material conflict of interest is not supportable.  If the drafters wished to introduce an element of analysis to the language in subpart (E), they knew how to explicitly do so, as evidenced by the language of subpart (F).  *See* MSRB Rule G-42(b)(i)(F) (identifying as a material conflict "any other actual or potential conflicts of interest, *of which the municipal advisor is aware after reasonable inquiry*") (emphasis added).  Nothing in the language of subpart (E) indicates advisors are expected to analyze each contingent fee arrangement and determine if it presents a material conflict before disclosure is required.

Rather, the plain language supports the conclusion that a contingent fee arrangement based on the size or closing of a transaction creates a material conflict of interest, and the nature of the conflict must accordingly then be disclosed.

The MSRB's comments during the rulemaking process fully support this conclusion. During the rulemaking process it noted that "Section (b) of Proposed Rule G-42 would include *a non-exhaustive list of matters that would always constitute material conflicts of interest* and that would be required to be disclosed by municipal advisors under the proposed rule change." (Dkt. 74-10 at 2, 16 (80 Fed. Reg. 26752, 26766 (May 8, 2015)) (emphasis added)); *see also id.* at 3 (80 Fed. Reg. 26753) ("The provision would set forth a non-exhaustive list of scenarios *under which a material conflict of interest would arise or be deemed to exist* and that would require a municipal advisor to provide written disclosures to its client.") (emphasis added). It further notes that the relevant subparts, (b)(i)(B) through (F), "would provide more specific scenarios that give rise to conflicts of interest that would be deemed to be material and require proper disclosure to a municipal advisor's client." (*Id.*). Thus "[u]nder the proposed rule change, a material conflict of interest would always include . . . any conflicts of interest arising from compensation for municipal advisory activities to be performed that is contingent on the size or closing of any transaction as to which the municipal advisor is providing advice." (*Id.* at 3-4 (80 Fed. Reg. 26753-54)).

In its responses to comments during the rulemaking, the MSRB also made clear its intent to include contingency fee arrangements based on the size or closing of the transaction within the list of fees that, by definition, presented material conflicts of interest

subject to mandatory disclosure.  One commenter stated that "[i]n their view, characterizing a contingent fee arrangement as a conflict of interest requiring disclosure to the client amounted to advising a client that the municipal advisor may not be acting in the client's best interest."  (*Id.* at 14 (80 Fed. Reg. 26764)).  Such a disclosure, the commenter opined, "would serve no useful purpose and could confuse clients."  (*Id.*).  Other commenters opined that "fee arrangements of any sort (hourly, fixed or non-contingent) create an adversarial relationship between the municipality and its client," making specific disclosures unnecessary, and others suggested that "the potential conflicts of interest that are inherent in all fee arrangements are also 'generally knowable' to both sides of a transaction and therefore the . . . disclosure requirement would not be beneficial."  (*Id.*)

The MSRB responded that it:

> has considered the arguments and alternatives advanced by commenters and determined that requiring the disclosure of conflicts of interest arising from fee arrangements contingent on the size or closing of the transaction as to which the municipal advisor is providing advice is an appropriate and necessary measure to alert municipal entity and obligated person clients to the potential conflict of interest inherent in such fee arrangements.  While the MSRB recognizes, as some commenters pointed out, that other fee arrangements (such as hourly, fixed or otherwise non-contingent) might also give rise to conflicts, the MSRB believes that the potential harm to a client might be particularly acute if a client is not informed of a conflict of interest arising from a contingent fee arrangement.  Furthermore, the MSRB does not agree with commenters that have argued that requiring a conflict of interest disclosure would suggest that the municipal advisor is not acting in the best interest of its client.  The purpose of the disclosure requirement . . . simply would be to allow a municipal advisor's client to make an informed decision based on relevant facts and circumstances.  Also . . . municipal advisors would have the opportunity to provide a client with additional context about the benefits and drawbacks of other fee arrangements in relation to a contingent fee arrangement so that the client could choose a fee arrangement that serves its needs.

(*Id.* at 15 (80 Fed. Reg. 26765)).

In responding to similar comments made later in the rulemaking process, the MSRB reiterated its position that requiring the disclosure of conflicts of interest arising out of contingency compensation "is an appropriate and necessary measure to protect municipal entity and obligated person clients." (Dkt. 74-11 at 2, 10 (80 Fed. Reg. 81614, 81622 (Dec. 30, 2015))). It noted that similar disclosures were required in analogous situations, such as when a dealer acts as an underwriter, because contingency fee arrangements "may present a conflict of interest as a result of the underwriter's financial incentive to recommend a transaction that is unnecessary or to recommend that the size of the transaction be larger than is necessary." (*Id.* at 10-11 (80 Fed. Reg. 81622-23)). "The MSRB believes that the scenarios in which the proposed paragraph (b)(i)(E) would apply are substantially similar, are subject to the same concerns, and warrant the application of similar disclosure requirements to help make transparent potential conflicts of interest." (*Id.* at 11 (80 Fed. Reg. 81623); *see also* Dkt. 74-7 at 8 (MSRB Regulatory Notice 2016-03 (noting that Rule G-42(b)(i) "set[s] forth a non-exhaustive list of scenarios *under which a material conflict of interest is always deemed to exist . . .*") (emphasis added))). Nothing in the MSRB's rulemaking indicates it considered disclosure of potential conflicts of interest arising out of these types of contingency fee arrangements anything other than material, or that it intended for advisors to make a pre-disclosure determination that any given contingency fee arrangement presented a material conflict subject to disclosure.

CMA's proposed reading effectively places the proverbial fox in charge of the henhouse, as the municipal advisor would act as the sole arbiter of whether its own

contingency fee arrangements created a conflict of interest.  Such a reading is at odds with both the plain language of the regulation and the MSRB's stated purposes in promulgating it.  Accordingly, the Court rejects CMA's interpretation.

###### B.     Materiality

CMA argues in opposition to the SEC's motion that "materiality" under the securities law is a mixed question of law and fact, such that a conflict cannot be found material "under the Federal securities laws without any reference to the relevant facts and circumstances associated with the transaction."  (Dkt. 84 at 6).  It is true that when a court is determining materiality it is deciding a mixed question of law and fact.  *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).  But nothing requires the MSRB to adopt that definition of materiality in the context of rulemaking undertaken at Congress's direction to "provide professional standards" for municipal advisors.  15 U.S.C. § 78o-4(b)(2)(L)(i) & (iii).  Nor is there anything in the Exchange Act that bars the MSRB from deeming certain fee arrangements as presenting material conflicts of interest as a matter of law.

The MSRB's rulemaking authority "with respect to municipal advisors" extends to "prescrib[ing] means reasonably designed to prevent acts, practices, and courses of business [that] are not consistent with a municipal advisor's fiduciary duty to its clients" and to "provide professional standards."  *Id*. § 78o-4(b)(2)(L)(i) & (iii).  Deeming certain conflicts "material" is entirely consistent with the MSRB's regulatory mandate.  *See, e.g., SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 196 (1963) (noting that "[a]n investor seeking the advice of a registered investment adviser must, if the legislative purpose is to be served, be permitted to evaluate such overlapping motivations, through

appropriate disclosure, in deciding whether an adviser is serving two masters or only one, especially if one of the masters happens to be economic self-interest") (quotation marks omitted).

In addition, CMA argues that its contingent fee arrangements did not create conflicts of interest because its "fees concerning sales of securities by any one municipal client were never material to CMA, and, therefore, never created a material conflict of interest with respect to the financial advice given by CMA to that municipal client." (Dkt. 78-1 at 13). Not only does this argument depend on an interpretation of Rule G-42(b)(i)(E) whereby the municipal advisor determines whether a conflict exists—an argument rejected by the Court for the reasons set forth above—but materiality is not measured by whether a fee is material to the municipal advisor. The disclosure rule is meant to be "an appropriate and necessary measure to protect municipal entity and obligated person clients." (Dkt. 74-11 at 2, 10 (80 Fed. Reg. 81614, 81622 (Dec. 30, 2105))). Materiality is thus evaluated through the viewpoint of the municipal clients. In other words, the MSRB has determined that a contingency arrangement based on the size of the bond or closing of a transaction creates a material conflict of interest that must be disclosed to protect the clients. Disclosure is not dependent on whether the municipal advisor views the arrangement as material.

This approach is consistent with the cases decided under the Investment Advisors Act of 1940, which created a duty for investment advisors "to disclose material information about the advisor's conflict of interest even if the adviser had no intent to injure his clients and even if his clients were not injured at all." *SEC v. Westport Capital Markets, LLC*, 408

F. Supp. 3d 93, 103-04 (D. Conn. 2019) (citing 15 U.S.C. § 80b-6(1)).[8] "As the Supreme Court has made clear, an investment adviser's duty to disclose the grounds for a conflict of interest is broad, because '[t]he Investment Advisers Act of 1940 was directed not only at dishonor, but also at conduct that tempts dishonor.'" *Id.* (citing *Capital Gains*, 375 U.S. at 200). In imposing a fiduciary duty on investment advisers, Congress created both "an affirmative obligation to employ reasonable care to avoid misleading [] clients" and "an affirmative duty of utmost good faith." *Capital Gains*, 375 U.S. at 194 (internal quotation marks and footnotes omitted). Thus, investment advisors must tell their clients about "all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested." *Capital Gains*, 375 U.S. at 191-92; *see also, e.g., SEC v. Cutter Fin. Group, LLC*, No. 23-cv-010589-DJC, 2023 WL 8653927, at *5 (D. Mass. Dec. 14, 2023) ("A fact is 'material' if 'there is a substantial likelihood that [it] would affect the behavior of a reasonable investor.'") (quoting *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008)); *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 182 (D.R.I. 2004) ("Potential conflicts of interest are always material.").

### C.   First Amendment

In its opposition to the SEC's motion, CMA also raises a First Amendment challenge, contending that it "cannot be compelled to communicate to clients that the

---

[8]    The MSRB turned to the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, for guidance in drafting Rule G-42.  (Dkt. 74-10 at 12 (80 Fed. Reg. at 26762) ("In developing Proposed Rule G-42, the MSRB consulted various codes of conduct and sources of federal and state law regarding the duties and obligations of a fiduciary. . . .  The MSRB believes the Investment Advisors Act is particularly relevant in developing a rule regarding fiduciary duties and obligations. . . .")).

contingent fee arrangement creates a material conflict of interest between CMA and the client when that statement does not reflect CMA's belief and the statement is not true." (Dkt. 84 at 9).  As a preliminary matter, the SEC argues this argument is waived because it was raised for the first time in CMA's opposing papers.  (Dkt. 88 at 5).  Given that the issue is a question of law, and the SEC had an opportunity respond to the argument by filing a memorandum in reply, the Court will decide the argument on the merits.

The parties agree that the speech at issue here is commercial speech.  (Dkt. 84 at 11; Dkt. 88 at 10).  Commercial speech is "entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded noncommercial speech." *See Zauderer v. Off. Disciplinary Couns. Sup. Ct. Ohio*, 471 U.S. 626, 637 (1985) (quotation marks omitted).  "The regulation of commercial speech is subject to different levels of review, depending on the nature of the law." *Safelite Group, Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014).  Generally, "a restriction on commercial speech is subject to intermediate scrutiny, that is, a determination of whether the restriction directly advances a substantial governmental interest and is not overly restrictive." *Id.* (citing *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557, 564 (1980)).  "In *Zauderer*, however, the Court created an exception that an informational disclosure law—as opposed to a prohibition on speech—was subject to rational review, that is, a determination of whether the required disclosure is reasonably related to the state's interest." *Id.* at 262; *see also Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-15 (2d Cir. 2001) (informational disclosure laws are subject to less scrutiny than commercial speech restrictions).

In *Zauderer*, plaintiff, an attorney, advertised that his office took certain cases "on a contingent fee basis of the amount recovered.  If there is no recovery, no legal fees are owed by our clients."  471 U.S. at 631.  A disciplinary complaint was brought against him, in relevant part, for violating an Ohio professional responsibility rule that provided "any advertisement that mentions contingent-fee rates must 'disclose whether percentages are computed before or after deduction of court costs and expenses. . . .'"  *Id*. at 633.  The complaint alleged "that the ad's failure to inform clients that they would be liable for costs (as opposed to legal fees) even if their claims were unsuccessful rendered the advertisement deceptive. . . ."  *Id*.  Zauderer sued, arguing that the disclosure requirement violated his First Amendment rights.

The Supreme Court found that there are "material differences between disclosure requirements and outright prohibitions on speech."  *Id*. at 650.  "In requiring attorneys who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses, Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present."  *Id*.  While "in some instances compulsion to speak may be as violative of the First Amendment as prohibitions on speech," a requirement that an attorney "include in his advertising purely factual and uncontroversial information" presents a different set of interests than when the government attempts to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id*. at 650-51 (citation omitted).  Because "disclosure requirements trench much more

narrowly on an advertiser's interests than do flat prohibitions on speech," the Court held "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id*. at 651.

CMA relies on *Safelite* for the proposition that Rule G-42(b)(i)(E) is not an informational disclosure rule, but instead constitutes compelled commercial speech subject to intermediate scrutiny. In *Safelite*, plaintiff, an insurance company, offered policies covering auto-glass repair and replacement. 764 F.3d at 259. If a policyholder called the insurance company with a glass-related claim, the insurance company would recommend using an affiliated company that did auto-glass repairs. *Id*. Connecticut enacted a law prohibiting automobile insurers and claims adjusters "from mentioning their affiliates with regard to glass claims unless they also name a competitor." *Id*. at 260. The district court found that the law created a factual and uncontroversial disclosure regulation subject to reasonable basis review under *Zauderer*, but the Second Circuit disagreed. *Safelite*, 764 F.3d at 262. The Circuit found that because the law "compels speech that goes beyond the speaker's own product or service, . . . intermediate scrutiny applies. . . ." *Id*. at 264. It distinguished between "disclosure requirements about a company's own products or services," as opposed to a competitor's products or services, and found the "distinction is important, indeed, dispositive in this case." *Id*. The Circuit determined that the Connecticut law fell outside *Zauderer*'s ambit, and was subject to intermediate scrutiny review.

CMA's reliance on *Safelight* is unavailing. Rule G-42(b)(i)(E) requires no more than the disclosure of factual, uncontroversial information, and requires CMA to speak only

about its own products and services, not about its competitors. *Safelite*, 764 F.3d at 263.

That distinction was critical to *Safelite*'s analysis:

> The law does not mandate disclosure of any information about products or services of affiliated glass companies or of the competitor's products or services. Instead, it requires that insurance companies or claims administrators choose between silence about the products and services of their affiliates or give a (random) free advertisement for a competitor. This is a regulation of content going beyond mere disclosure about the product or services offered by the would-be speaker. Indeed, it prevents the speaker from making such disclosure by requiring advertisements for a competitor and thereby deters helpful disclosure to consumers. Unlike the earlier mentioned cases that applied *Zauderer*'s rational basis test, the speech requirement here does more to inhibit First Amendment values than to advance them.

*Id*. at 264.

CMA next attempts to distinguish *Zauderer* by arguing that Rule G-42(b)(i)(E) is neither "factual" nor "uncontroversial." (Dkt. 84 at 9). It is not factual, CMA argues, because none of CMA's "contingent fee arrangements have ever created a material conflict of interest between CMA and its clients." (*Id.*). Thus, "CMA cannot be compelled to mischaracterize the contingent fee arrangements that CMA entered into with its clients as creating a material conflict of interest." (*Id.*). This argument misses the mark—nothing in Rule G-42(b)(i)(E) requires CMA to affirmatively state that its own fee arrangements definitively create a material conflict of interest. *See, e.g., Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 625 (D. Vt. 2015) (noting that law requiring disclosure of the presence of genetically engineered ("GE") food "does not require GE manufacturers and retailers to convey a 'preferred message' about that fact, and it applies regardless of a manufacturer's or retailer's own view of GE and GE foods"). Rule G-42(b)(i)(E) does not require

advocating for a different sort of fee arrangement, or referring clients to advisors who offer

different types of fee arrangements.  It does not bar contingency fee arrangements, and it

places no limitations on what municipal advisors may say in defense of such arrangements.

The SEC points to the model disclosure language developed by the Securities Industry and

Financial Markets Association as an example:

> The fees due under this Agreement will be based on the size of the [i]ssue
> and the payment of such fees shall be contingent upon the delivery of the
> [i]ssue. While this form of compensation is customary in the municipal
> securities market, this may present a conflict because it could create an
> incentive for Municipal Advisor to recommend unnecessary financings or
> financings that are disadvantageous to Client, or to advise Client to increase
> the size of the issue. This conflict of interest is mitigated by the general
> mitigations described above.

 (Dkt. 74-9 at 3, ¶ V).

Nor is the required disclosure controversial.  CMA attempts to draw an analogy to

*The Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233 (2d Cir. 2014).  There the City of

New York adopted an ordinance requiring pregnancy services centers to disclose three

categories of information: (1) whether they provide, or make referrals for, abortion and

emergency contraception (the "Service Disclosure"); (2) whether they have a licensed

medical provider on staff (the "Status Disclosure"); and (3) that the city encourages

pregnant women to consult with a licensed medical provider (the "Government Message").

*Id.* at 238.   The Second Circuit determined neither the Service Disclosure nor the

Government Message could be considered informational disclosures.  *Id*. at 245 n.6.  The

Service Disclosure and Government Message could not be considered uncontroversial

because both arose in the "context [of] a public debate over the morality and efficacy of

contraception and abortion, for which many of the facilities regulated [] provide alternatives." *Id.* at 249; *see id.* at 245 n.6 ("Neither the Government Message nor the Services Disclosure require disclosure of 'uncontroversial' information. The Government Message requires pregnancy services centers to state the City's preferred message, while the Services Disclosure requires centers to mention controversial services that some pregnancy services centers, such as Plaintiffs in this case, oppose."). Both the Government Message and Services Disclosure failed to pass constitutional muster under intermediate review. *Id.* at 245. As to the Status Disclosure, the Circuit did not reach the issue of what level of review applied, because it "survive[d] under even strict scrutiny" review. *Id.* at n.6.

*Evergreen* makes clear that a court looks to the context in which the disclosure arises in determining whether it is controversial, rather than considering the debate surrounding the regulation's adoption. Rule G-42's required disclosure concerning contingency fees is easily distinguished from the Government Message and the Services Disclosure at issue in *Evergreen*. Rule G-42 does not touch on a political or religious topic, nor does it prevent CMA from presenting its own opinion concerning any potential conflicts created by a contingent fee arrangement. And Rule G-42 is one of many regulations and laws governing disclosures related to securities—regulations and laws regularly found not to violate the First Amendment under various levels of scrutiny. *See, e.g., SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 743 (S.D.N.Y. 2022) (examining First Amendment law vis-à-vis securities regulation) (collecting cases).

Moreover, "[a] factual disclosure does not reflect an opinion merely because it compels a speaker to convey information contrary to its interests." *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 629.  Disclosure rules requiring speakers to disclose facts with which the speakers disagree are consistently found not to offend the First Amendment. *See, e.g., Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d at 113-15 (2d Cir. 2001) (statute mandating that "manufacturers of some mercury-containing products to label their products and packaging to inform consumers that the products contain mercury and, on disposal, should be recycled or disposed of as hazardous waste" was factual and uncontroversial speech that did not offend First Amendment even where trade association argued the disclosure forced them to speak when they would rather remain silent); *New York State Rest. Ass'n v. New York City Board of Health,* 556 F.3d 114, 131-34 (2d Cir. 2009) (regulation that required certain restaurants to post calorie content information on their menus and menu boards did not violate First Amendment because it compelled "factual and uncontroversial information by commercial entities," even though not all restaurants wanted "to communicate to their customers that calorie amounts should be prioritized among other nutrient amounts") (internal quotation marks omitted); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) ("We . . . do not understand country-of-origin labeling to be controversial in the sense that it communicates a message that is controversial for some reason other than dispute about simple factual accuracy.").

Therefore, because Rule G-42(b)(i)(E) is an informational disclosure rule, it is "subject to rational review, that is, a determination of whether the required disclosure is reasonably related to the state's interest." *Safelite*, 764 F.3d at 262. "When a party seeks

to invalidate a law under rational review, the burden of persuasion is on the party challenging a law, who must disprove every conceivable basis which might support it." *Poughkeepsie Supermarket Corp. v. Dutchess County, N.Y.*, 648 F. App'x 156, 158 (2d Cir. 2016) (quotation marks and brackets omitted).

Congress directed the MSRB to promulgate rules "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . to remove impediments to and perfect the mechanism of a free and open market . . . and, in general, to protect investors, municipal entities, obligated persons, and the public interest. . . ." 15 U.S.C. § 78o-4(b)(2)(C). CMA offers no argument as to why Rule G-42(b)(i)(E) is not reasonably related to the MSRB's legitimate interest in insuring participants in the municipal securities market are fully informed as to potential conflicts so as to make the best possible decisions. The MSRB determined that mandatory disclosure of conflicts of interest inherent in certain fee arrangements, including certain contingency fee arrangements, "is an appropriate and necessary measure to protect municipal entity and obligated person clients." (Dkt. 74-11 (80 Fed. Reg. at 81622)). As the SEC points out, such disclosures "alert[] clients to conflicts of interest so they better can evaluate the municipal advisor's advice and whether that advice may be colored by the municipal advisor's financial incentives." (Dkt. 88 at 9). Nor does the regulation unduly burden speech. As discussed above, CMA is free to make clear that the views belong to the MSRB, and to tell its clients why, in its view, the contingency nature of the arrangement "will not impact their advice or otherwise harm their clients." (Dkt. 88 at 10). Rule G-42(b)(i)(E) thus is reasonably related to a legitimate government interest in regulating the municipal

securities market and is not overly burdensome.  *See, e.g., Nat'l Elec. Mfrs. Ass'n*, 272 F.3d

at 116 ("Innumerable federal and state regulatory programs require the disclosure of

product and other commercial information.  To hold that the Vermont [labelling] statute is

insufficiently related to the state's interest in reducing mercury pollution would expose

these long-established programs to searching scrutiny by unelected courts.  Such a result

is neither wise nor constitutionally required.") (citing 2 U.S.C. § 434 (reporting of federal

election campaign contributions); 15 U.S.C. § 78l (securities disclosures); 15 U.S.C.

§ 1333 (tobacco labeling); 21 U.S.C. § 343(q)(1) (nutritional labeling); 33 U.S.C. § 1318

(reporting of pollutant concentrations in discharges to water); 42 U.S.C. § 11023 (reporting

of releases of toxic substances); 21 C.F.R. § 202.1 (disclosures in prescription drug

advertisements); 29 C.F.R. § 1910.1200 (posting notification of workplace hazards); Cal.

Health & Safety Code § 25249.6 ("Proposition 65"; warning of potential exposure to

certain hazardous substances); N.Y. Envt'l Conserv. Law § 33-0707 (disclosure of pesticide

formulas)).

Two decisions from outside the Second Circuit also support finding that Rule G-

42(b)(i)(E) is not constitutionally suspect.  In *Chamber of Commerce v. SEC*, the Fifth

Circuit found that compelled disclosure about stock repurchases did not violate the First

Amendment.  85 F.4th 760, 772 (5th Cir. 2023).  The Court reasoned that "the rationale-

disclosure requirement neither burdens issuers' protected speech nor drowns out their

message.  The issuer is free to speak (or not) however and whenever it wishes apart from

a privately crafted explanation of its reasons for repurchasing shares."  *Id*.  Similarly, the

First Circuit held that a Maine law requiring pharmacy benefit managers to disclose

conflicts of interest to their clients was not impermissible compelled speech. *See Pharmaceutical Care Management Association v. Rowe*, 429 F.3d 294, 308-09 (1st Cir. 2005).

For the reasons given above, the Court concludes MSRB Rule G-42(b)(i)(E) does not offend the First Amendment.

### D.     Due Process

Alternatively, CMA argues that the SEC failed to give sufficient notice of Rule G-42's disclosure requirements to satisfy the requirements of due process.  (Dkt. 78-1 at 15-16.  It is well settled that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," and that a regulation will be unconstitutionally vague if "it is unclear as to what fact must be proved." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  In determining whether a regulation is unconstitutionally vague, a court "must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited. . . ." *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir. 1993) (quotation marks omitted).

Rule G-42 easily satisfies that standard. As discussed above, Rule G-42 is not ambiguous—it clearly requires disclosing all material conflicts of interest and defines certain contingency agreements as posing material conflicts of interest. *See Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (no due process violation where "plain language of the standard gives fair notice of what it requires") (citation and internal punctuation omitted).  The SEC issued regulatory guidance indicating that conflicts arising out of certain contingency fee arrangements were considered conflicts subject to disclosure

under Rule G-42.   (Dkt. 74-7 at 7-8 (regulatory notice including contingency fee arrangements in the list of "scenarios under which a material conflict of interest is always deemed to exist," requiring disclosure); Dkt. 74-8 at 2 (regulatory notice noting that a municipal advisor must disclose "[i]nformation regarding any of the multiple scenarios identified in the rule, which are viewed as always giving rise to a material conflict of interest"); Dkt. 74-10 at 3-4 (80 Fed. Reg. at 26753-54) (noting that "[u]nder the proposed rule change, a material conflict of interest would always include . . . any conflicts of interest arising from" certain contingent fee arrangements)).   Where, as here, "the SEC has— through its regulations, written guidance, litigation, or other actions—provided a reasonable person operating within the defendant's industry fair notice that their conduct may prompt an enforcement action by the SEC, it has satisfied its obligations under the Due Process Clause." *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR), ___ F. Supp. 3d ___, 2023 WL 4858299, at *10 (S.D.N.Y. July 31, 2023).   Accordingly, CMA's due process argument is without merit.

### III.   Cross-Motions for Summary Judgment on MSRB Rule G-44

The SEC also contends that the stipulated facts demonstrate that the CMA Defendants failed to establish, implement, and maintain written supervisory procedures as required by MSRB Rule G-44.   (Dkt. 77-1 at 25-27).   The CMA Defendants both oppose the motion and move for summary judgment on the ground that the stipulated facts demonstrate that at all times relevant they were in compliance with the requirement for written supervisory procedures.   (Dkt. 78-1 at 17).   The cross-motions for summary

judgment pertaining to MSRB Rule G-44 relate to the ninth and eleventh causes of action. (Dkt. 1 at ¶¶ 102-104, 110-113).

Rule G-44 requires municipal advisors to establish, implement, and maintain written supervisory procedures, and that such supervisory procedures be "reasonably designed to ensure that the conduct of the municipal advisory activities of the municipal advisor and its associated persons are in compliance with applicable rules." MSRB Rule G-44(a)(i). Rule G-44 went into effect in April 2015. (Dkt. 74 at ¶ 39). CMA did not establish formal written procedures until November 2018. (*Id*. at ¶ 40). Nevertheless, CMA argues that it complied with Rule G-44 because "unrebutted statements" by Tortora demonstrate that the documents included at Docket 76-9 (Exhibit 49 to the Stipulated Facts) existed prior to November 2018 and satisfied Rule G-44's requirements. (Dkt. 84 at 11). The documents attached at Docket 76-9 address three MSRB rules—Rule G-20 (receipt of gifts and gratuities), Rule G-37 (political contributions), and Rule G-44 (establishing procedures). (Dkt. 76-9).

The SEC argues that as a matter of law, the documents assembled at Docket 76-9 do not comply with Rule G-44 because they are not "reasonably designed to ensure that the conduct of the municipal advisory activities of the municipal advisor and its associated persons are in compliance with applicable rules." (Dkt. 77-1 at 26). The SEC argues that the documents fail to address key issues regarding municipal advisory activities, such as Rule G-42, which sets out "core standards of conduct and duties of municipal advisors," or Rule G-17, the "fair dealing rule," which sets out the requirements that must be followed in issuing municipal securities. (*Id*.). And even after CMA developed and adopted a

satisfactory set of formal written procedures, the SEC argues that CMA failed to make the necessary Rule G-42 disclosures.  (*Id.* at 26-27).

CMA relies on Tortora's testimony before SEC staff in October 2021 to support its argument it complied with Rule G-44:

> Q:      Okay. So this is the . . . draft Written Supervisory Procedures that were mentioned in the response to the exam letter?
>
> A:      Yes.
>
> Q:      Okay.
>
> A:      We took it to be a living document.  We revised it as often as we needed to.  So we didn't necessarily deem it to be a draft.  It was just a document that was subject to ongoing revision.

(Dkt. 74 at ¶ 42).  Tortora's testimony fails to address the substance of the SEC's argument that the documents attached at Docket 76-9 were inadequate as a matter of law.  The SEC is correct that the failure to include a discussion regarding conflicts of interest under Rule G-42—which the SEC points out covered more than 10 pages in the written supervisory provisions adopted by CMA in November 2018—establishes a violation of Rule G-44 as a matter of law.  *See, e.g., SEC v. Commonwealth Equity Servs. LLC*, Civil Action No. 1:19-cv-11655-IT, 2023 WL 2838691, at *15 (D. Mass. April 7, 2023) (SEC demonstrated, as a matter of law, failure to comply with requirement to establish written supervisory procedures under the Advisors Act where said procedures did not address conflicts of interest); *SEC v. Ambassador Advisors*, 576 F. Supp. 3d 286, 303 (E.D. Pa. 2021) (same).

In support of its motion for summary judgment, CMA argues that it "monitored the outside business activities of all employees," ensuring there were no conflicts of interest.

(Dkt. 78-1 at 17).  Accepting this as true, it is not sufficient to establish compliance with Rule G-44, which calls for written supervisory procedures.  Accordingly, the Court grants the SEC's motion for summary judgment as to liability on the ninth and eleventh causes of action and denies the CMA Defendants' motion for summary judgment on those claims.

## IV.  Cross-Motions for Summary Judgment on Unfair and Deceptive Practices

Finally, the SEC argues the CMA Defendants breached the fiduciary duties owed their clients under both section 15B(c)(1) of the Exchange Act, 15 U.S.C. § 78o-4(c)(1), and MSRB Rules G-42(a)(ii) and G-17, and in doing so, engaged in deceptive and unfair practices.  (Dkt. 77-1 at 27).  Both in opposing the SEC's motion and in their own motion for summary judgment, the CMA Defendants argue that they did not breach a duty owed their clients, relying on their interpretation of the requirements of MSRB Rule G-42.  (Dkt. 78-1 at 16-17; Dkt. 84 at 7 n.3).[9]  These cross-motions pertain to the sixth cause of action (alleging the CMA Defendants violated MSRB Rule G-17 by engaging in a deceptive, dishonest, or unfair practice (Dkt. 1 at ¶¶ 92-95)), the seventh cause of action (alleging the

---

[9]     The CMA Defendants' arguments in opposition to any claim of breach of fiduciary duty and unfair and deceptive practices, rise and fall on accepting their arguments concerning their compliance with MSRB Rule G-42.  In their initial motion for summary judgment, the CMA Defendants make a cursory argument with no real analysis that they did not violate their fiduciary duties, ostensibly relying on their arguments that there was no breach of MSRB Rule G-42 concerning disclosure of material conflicts of interest.  (*See* Dkt. 78-1 at 16-17; *see also id.* at 6 n.1).  Then, in opposition to the SEC's motion for summary judgment, the CMA Defendants relegate their response to the SEC's argument on this point to a footnote, stating that because they did not breach MSRB Rule G-42, they also did not engage in unfair and deceptive practices.  (Dkt. 84 at 7 n.3).  As discussed previously in this Decision and Order, the Court rejects the CMA Defendants' interpretation of MSRB Rule G-42.

CMA Defendants violated MSRB Rule G-42 by breaching the duty of loyalty owed by a non-solicitor municipal advisor (*id*. at ¶¶ 96-98)), and the tenth cause of action (alleging the CMA Defendants violated section 15B(c)(1) of the Exchange Act, 15 U.S.C. § 78o-4(c)(1) by breaching their fiduciary duties (*id*. at ¶¶ 105-109)).[10]

"A municipal advisor and any person associated with such municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom such municipal advisor acts as a municipal advisor, and no municipal advisor may engage in any act, practice, or course of business which is not consistent with a municipal advisor's fiduciary duty or that is in contravention of any rule of the Board."  15 U.S.C. § 78o-4(c)(1).  MSRB Rule G-42(a)(ii) also creates a fiduciary relationship between municipal advisors and their clients.  *See* MSRB Rule G-42(a)(ii) ("A municipal advisor to a municipal entity client shall, in the conduct of all municipal advisory activities for that client, be subject to a fiduciary duty that includes a duty of loyalty and a duty of care.").  MSRB Rule G-17 provides that "[i]n the conduct of its municipal securities or municipal advisory activities, each broker, dealer, municipal securities dealer, and municipal advisor shall deal fairly with

---

[10]    The twelfth cause of action alleges, in part, that Ganci and Tortora are alternatively liable for aiding and abetting CMA's violations of MSRB Rules G-17, G-42, and G-44, as well as section 15B(c)(1) of the Exchange Act, to the extent they are not found primarily liable for those violations.  (Dkt. 1 at ¶ 120).  The SEC has not briefed this issue because of its view that Ganci and Tortora are primarily liable.  (*See* Dkt. 77-1 at 30 n.9).  For the reasons discussed herein, the Court agrees that Ganci and Tortora are primarily responsible for the breaches, and indeed, the CMA Defendants make no argument that Ganci and Tortora do not bear primary liability in the event the Court accepts the SEC's position concerning the relevant rules and their requirements.  Accordingly, the Court does not dispose of the twelfth cause of action at this time, which also addresses other alternative theories of liability pertaining to other claims not at issue on the pending motions.

all persons and shall not engage in any deceptive, dishonest, or unfair practice."  MSRB
Rule G-17.

The Second Circuit has yet to address the standard of proof to establish a municipal
advisor's breach of a fiduciary duty owed to a municipal client.  The SEC urges the Court
to adopt the same standard used to analyze claims brought under an analogous section of
the Investment Advisors Act, which requires the SEC to prove a defendant acted
negligently.  *See Capital Gains*, 375 U.S. at 194.  The Ninth Circuit applies a negligence
standard to MSRB Rule G-17 violations.  *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852,
856 (9th Cir. 2001).  The CMA Defendants do not address the issue of what standard applies
in either their memorandum of law in support of their motion for summary judgment or in
opposition to the SEC's motion.  The Court agrees that the negligence standard applied
under the Investment Advisors Act also applies here.

The SEC argues CMA failed to exercise reasonable care in making the required Rule
G-42 disclosures to their clients because it either (1) affirmatively represented CMA had
no conflicts of interest, or (2) made no conflict disclosures at all.  (Dkt. 77-1 at 28 (citing
Dkt. 74 at ¶ 15 (contracts purporting to disclose CMA had no conflict of interest); *id*. at
¶ 18 (contracts lacking any conflicts disclosure)).  The SEC also takes issue with Tortora's
sworn statement to the SEC, in which he stated that CMA included a Rule G-42 disclosure
statement in each client contract.  (Dkt. 76-10 at 2).  The SEC notes that hundreds of CMA
contracts lacked any Rule G-42 disclosure language.  (Dkt. 74 at ¶ 18).

The CMA Defendants argue they made the required disclosures.  (Dkt. 84 at 7 n.3).
They point to the December 2018 email blast sent to CMA's clients, which stated in relevant

part that "[t]o CMA's knowledge and belief, neither CMA nor any associated person has any material undisclosed conflict of interest," and "CMA may have conflicts of interest arising from compensation for municipal activities to be performed that are contingent on the size or closing of such transaction for which CMA is providing advice. This potential conflict of interest exists if CMA should fail to get paid for its work on a transaction in the event that transaction does not close." (Dkt. 74 at ¶ 37). CMA notes that a municipal advisor does not need to include conflicts of interest disclosures in every transaction "if the municipal advisor previously fully complied with the rule's disclosure requirements and there have been no material changes in the information since it was provided to a client." (Dkt. 74-8 at 3).

The December 2018 email cannot reasonably be viewed as complying with Rule G-42's disclosure requirements. It suggests that the only potential conflict that could arise is if CMA ultimately was not paid for its work, and it does not state that contingent fee arrangements by their very nature pose conflicts of interest at the outset of the relationship because such arrangements may provide an incentive to recommend a larger-than-necessary debt issuance, or to close on a deal with less-than-favorable terms. (*See, e.g.,* Dkt. 74-9 at 4, V (noting that contingent fee arrangements "may present a conflict because it could create an incentive for Municipal Advisor to recommend unnecessary financings or financings that are disadvantageous to Client, or to advise Client to increase the size of the issue")). In addition, even if the language in the email blast was construed as complying with the disclosure requirements of MSRB Rule G-42(b)(i)(E), it still would not satisfy the CMA Defendants' obligations because, as the SEC points out in opposition to the CMA

- 36 -

Defendants' motion for summary judgment, MSRB Rule G-42 requires disclosure of conflicts of interest "prior to or upon engaging in municipal advisory activities. . . ." The December 2018 email was sent to many clients long after the provision of municipal advisory activities, and in other cases CMA commenced new contractual engagements after the email was sent and never made the required disclosures. (*See* Dkt. 77-1 at 24-25). The Court agrees with the SEC that "one email blast over a six-year period does not satisfy CMA's disclosure obligations." (*Id*. at 24).

CMA's failure to make the required disclosures is a breach of its duty of loyalty. *See Capital Gains*, 375 U.S. at 201 (Investment Advisors Act "in recognition of the adviser's fiduciary relationship to his clients, requires that his advice be disinterested. To insure this it empowers the courts to require disclosure of material facts."); *Ambassador Advisors*, 576 F. Supp. 3d at 294 (to comply with Investment Advisors Act disclosure requirement, "investment advisors must make 'full and frank' disclosure of any practice that presents a conflict of interest") (quoting *Capital Gains*, 375 U.S. at 197).

In support of their motion for summary judgment, the CMA Defendants rely on *Ambassador Advisors* for the proposition that the duty owed "requires fiduciaries to make 'full and frank disclosure' of all financial benefits to be received by the fiduciary in connection with the fiduciary's services to the client." (Dkt. 78-1 at 17). According to the CMA Defendants' logic, because they "disclosed all forms of compensation received by CMA in connection with any sales of debt securities," and "[n]either CMA nor any of its employees received any financial benefit from any other person," there was no breach of fiduciary duty. (*Id*.). Not only does this argument ignore the express requirements of Rule

G-42(b)(i)(E), but *Ambassador Advisors* actually states "investment advisors must disclose their conflicts of interest," and that "the adequacy of [an advisor's] disclosures depends on whether those disclosures provided clients with the information an ordinary investor would reasonably have needed to understand and consent to [the advisor's] conflict of interest." 576 F. Supp. 3d at 300. Simply setting out CMA's compensation terms and not receiving a financial benefit from another person does not satisfy CMA's fiduciary duties. Rule G-42(b)(i)(E) plainly requires much more. Accordingly, the Court grants the SEC's motion for summary judgment on the sixth, seventh and tenth claims for relief, and denies the CMA Defendants' motion for summary judgment on those claims.

## <u>CONCLUSION</u>

For the foregoing reasons, the SEC's motion for summary judgment as to liability (Dkt. 77) on the regulatory claims set out in the sixth, seventh, eighth, ninth, tenth, and eleventh causes of action is granted, and the CMA Defendants' motion for summary judgment on those same claims (Dkt. 78) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: April 15, 2024
       Rochester, New York